RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

File Name: 08a0288p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

REGINA RUSSELL,

        *Plaintiff-Appellant,*

    *v.*

UNIVERSITY OF TOLEDO; RANDALL J. MCELFRESH;
NORINE T. WASIELEWSKI; KRISTINE ARMSTRONG;
and JOHN E. MILLS, M.D.,

        *Defendants-Appellees.*

> No. 07-3998

Appeal from the United States District Court
for the Northern District of Ohio at Toledo.
No. 05-07430—Jack Zouhary, District Judge.

Argued: June 3, 2008

Decided and Filed: August 12, 2008

Before: DAUGHTREY and MOORE, Circuit Judges; DUGGAN, District Judge.[*]

---

**COUNSEL**

**ARGUED:** Richard D. Brooks, BAILEY CAVALIERI, Columbus, Ohio, for Appellant. Cheryl F. Wolff, SPENGLER NATHANSON, Toledo, Ohio, for Appellees. **ON BRIEF:** Richard D. Brooks, Dennis D. Grant, BAILEY CAVALIERI, Columbus, Ohio, for Appellant. Cheryl F. Wolff, Theodore M. Rowen, SPENGLER NATHANSON, Toledo, Ohio, for Appellees.

---

**OPINION**

---

    MARTHA CRAIG DAUGHTREY, Circuit Judge. In this employment discrimination action, plaintiff Regina Russell appeals from the district court's order granting summary judgment to the defendants, the University of Toledo, Randall McElfresh, Norine Wasielewski, Kristine Armstrong, and John Mills, on the plaintiff's claims of disparate treatment, hostile work environment, and retaliation on the basis of race, brought pursuant to Title VII, 42 U.S.C. §§ 2000e - 2000e-17, chapter 4112 of the Ohio Revised Code, and 42 U.S.C. sections 1983 and 1985. Russell contends that she raised genuine issues of material fact that militate against the grant of summary judgment.

---

[*] The Honorable Patrick J. Duggan, United States District Judge for the Eastern District of Michigan, sitting by designation.

For the reasons discussed below, we conclude that the district court did not commit reversible errors of law in dismissing Russell's claims against the defendants, and we therefore affirm the order of summary judgment.

## *FACTUAL AND PROCEDURAL BACKGROUND*

Registered nurse Regina Russell, a long-time employee of the University of Toledo Student Medical Center, was terminated on May 19, 2005, for "failure of good behavior, gross insubordination, and neglect of duty." Russell, an African-American female, was first hired as a nurse at the center in 1992 and worked in that capacity throughout her 13-year employment with the university. That tenure was not, however, without its rough patches and its resulting disciplinary proceedings.

In fact, Russell complained that she was treated differently than other center employees and that the sole reason for such disparate treatment was her race. Specifically, in an affidavit filed in opposition to the defendants' motion for summary judgment and in her deposition testimony, the plaintiff asserted that, over the years of her employment: nurses with whom she worked expressed their beliefs that she received her job only through affirmative action programs; she was given less desirable working hours than even temporary employees; her workspace was deliberately located in the rear of the facility and was treated with less respect than the desks of other nurses; she was not permitted leave time to attend committee meetings and other functions when other nurses were; and she was disciplined more harshly than other employees who also failed to employ proper nursing methods.

Kristine Armstrong, the clinic coordinator at the Student Medical Center from 1997 through the time of Russell's termination, did not dispute that Russell often worked the latest shift at the center, that the plaintiff often used a desk at the back of the building, that Russell was denied permission to attend certain meetings and events, and that the plaintiff had received more frequent discipline than many other employees. Armstrong insisted, however, that race was never a factor in decisions affecting Russell and that legitimate considerations explained what Russell attempted to portray as discriminatory actions.

For example, the coordinator testified in her deposition that the nurses have no assigned desk but "have various schedules, various sites they work at." Referencing three of the nurses in the student medical center, Armstrong stated that "there is no Sandy desk, there is no Gay desk, there is no Regina desk." Furthermore, the late hours to which Russell was assigned resulted in part from the fact that "[s]he was the least senior nurse the entire time she was there" and from the fact that temporary contract employees could not be counted on to work those later, unsupervised hours by themselves. Armstrong's denial of the plaintiff's request for leave time to attend conferences or to work on university projects was also not race-based but a function of the need to staff the center at lunch times and at times when other nurses were already absent from the workplace.

According to the defendants, Russell's ultimate termination was, moreover, the culmination of an escalating pattern of misconduct and insubordination, as well as the inevitable result of a progressive discipline system provided for in a collective bargaining agreement that governed the plaintiff's employment. Armstrong testified that Russell failed to adhere to the center's triage policy, that she routinely arrived late to work in the mornings, and was chronically tardy in returning to work after lunch. She said that the plaintiff also often refused to usher patients to treatment rooms because she was addressing personal business in telephone calls or studying for her advanced degree. Consequently, Armstrong testified, the plaintiff had received verbal and written warnings from her supervisor from time to time.

In November 2003, Russell was sent for a pre-disciplinary hearing after failing to follow-up for two months on a tuberculosis skin test that had been performed on a University of Toledo

student. She was also suspended without pay for five days in November 2003 for failing to triage properly a distraught student who had not slept for four days and who visited the center at the request of the university counseling services. Rather than gather relevant information from the student and arrange for him to be seen by a physician, the plaintiff sent the young man away because he did not have a pre-arranged appointment at the center. Fortunately, a supervisor witnessed the episode, found the student sobbing on the grass outside the building, and brought him back inside for consultation with one of the doctors on duty. Notification of that suspension included a written warning to Russell that "[f]urther infractions of failure of Good Behavior and University Policy may result in more severe disciplinary action up to and including termination."

In the defendants' estimation, just such further "infractions" occurred on February 15, 2005. On that date, Dr. John Mills examined a patient who had previously been sutured at another medical facility and determined that the sutures could then be removed. He asked Russell to remove the sutures, a request with which the plaintiff did not comply based on her stated position that the student's visit would have had to have been classified as a nurse's visit, rather than a doctor's visit, for her to perform the procedure. Even after Mills *ordered* Russell to remove the sutures, she demurred, leading Mills to report the incident in an e-mail to Randall McElfresh, the university's director of labor employee relations. In that transmission, Mills noted:

> [I] have had recurrent and escalating difficulty having this nurse perform specific functions and nursing duties and have experienced general and sometimes overwhelming recalcitrance and a very disconcerting lack of professionalism, all of which ultimately impacts the level and quality [I] wish, and the medical center intends to provide. [S]adly, [I] am not alone in this experience.

On that same day, February 15, 2005, Mills and Russell were working together on a young man in respiratory distress. As explained by Mills in his deposition:

> And as is routine, be it in the ER or our workplace, I gave her verbal orders; and she knows a lot of things to do anyway, routine things that she does, and we stabilized the patient eventually.
>
> But the issue of contention was, I believe, the instruction or order more accurately to give intravenous methylprednisolone, Solumedrol is the generic name, after the IV was established. And I was writing the note, writing things out after the patient was being stabilized, and as minutes passed and the patient became stable after several aerosols and IV fluid and medications that were administered she brought the chart to me and asked me to change the order from IV to IM which stands for intramuscular. And I changed my order since she had told me that she had given it intramuscularly instead of intravenously to reflect the actual route of administration.

As a result of the February 15 disputes involving the intravenous/intramuscular drug administration and the suture removal, the university's labor relations manager, Joseph Klep, recommended that Russell be sent for a pre-disciplinary hearing on charges of gross insubordination and neglect of duty. Mills was also disciplined by the university "for an error in judgment" for his post-treatment alteration of the patient's medical records.

Russell's disciplinary hearing resulted in a May 19, 2005, decision to terminate the plaintiff's employment with the university. Subsequently, Russell filed a charge of racial discrimination with the Equal Employment Opportunity Commission (EEOC) and received from them a right-to-sue letter. The plaintiff then timely filed her complaint in federal district court, alleging Title VII violations of disparate treatment, maintenance of a hostile work environment, and retaliation; violation of the civil rights provisions of 42 U.S.C. section 1983; a conspiracy to violate her civil

rights in contravention of the provisions of 42 U.S.C. section 1985; violations of Ohio's anti-discrimination principles codified in chapter 4112 of the Ohio Revised Code; and violations of Ohio public policy.

Following a period of discovery, the defendants filed a motion for summary judgment, a motion that a magistrate judge recommended be granted. Objections filed by the plaintiff to the magistrate judge's report and recommendation were then considered by the district judge, who ultimately denied them in a memorandum opinion. In doing so, however, the district court specifically disagreed with the magistrate judge's conclusion that Russell failed to satisfy her burden of establishing a *prima facie* case of discrimination or retaliation. Nevertheless, the court determined that Russell did not adduce facts sufficient to raise a genuine issue of whether the defendants' actions were actually pretexts for forbidden discrimination and thus granted summary judgment for the defendants on each of Russell's causes of action.

## *DISCUSSION*

On appeal, Russell takes issue with most, but not all, of the substantive rulings made in this case by the magistrate judge and the district court. For example, she contends that the district court erred in concluding that the defendants' proffered reasons for terminating her employment at the Student Medical Center were not simply a pretext for prohibited racial discrimination; she insists that she offered evidence that similarly-situated employees were treated more favorably than she was; she argues that questions of fact existed as to whether the plaintiff established *prima facie* cases of hostile work environment discrimination and retaliation; and she maintains that the district court mistakenly believed that she did not sue defendants in their individual capacities in the count of the complaint alleging a section 1983 violation.

We review grants of summary judgment by a district court *de novo*. *See Ciminillo v. Streicher*, 434 F.3d 461, 464 (6th Cir. 2006). Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A genuine issue of material fact exists only when, assuming the truth of the non-moving party's evidence and construing all inferences from that evidence in the light most favorable to the non-moving party, there is sufficient evidence for a trier of fact to find for that party. A non-moving party cannot withstand summary judgment, however, by introduction of a "mere scintilla" of evidence in its favor. *See Ciminillo*, 434 F.3d at 464.

### Disparate Treatment

Russell raises claims of racial discrimination under both Title VII and section 4112 of the Ohio Revised Code. Those federal and state claims may be analyzed together, however, because "Ohio's requirements are the same as under federal law." *Carter v. Univ. of Toledo*, 349 F.3d 269, 272 (6th Cir. 2003).

Lacking any direct evidence of the defendants' racial discrimination, Russell attempted to prove her claims of disparate treatment by use of circumstantial evidence of discrimination according to the burden-shifting framework outlined in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), and *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248 (1981). Pursuant to that mode of analysis, a plaintiff must first establish a *prima facie* case of discrimination by showing that: "(1) she is a member of a protected group,(2) she was subject to an adverse employment decision, (3) she was qualified for the position, and (4) she was replaced by a person outside of the protected class." *Carter*, 349 F.3d at 273. A plaintiff may also satisfy the fourth prong of a *prima facie* case showing by adducing evidence that she "was . . . treated differently than similarly situated non-protected employees." *Newman v. Fed. Express Corp.*, 266 F.3d 401, 406 (6th Cir. 2001).

Establishment of a *prima facie* case by the plaintiff "creates a rebuttable presumption of discrimination, and the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for taking the challenged employment action. If the defendant satisfies this burden, the plaintiff 'must then prove that the proffered reason was actually a pretext to hide unlawful discrimination.'" *Id.* (citations omitted). To establish such pretext, a plaintiff must show "either (1) that the proffered reasons had no basis *in fact*, (2) that the proffered reasons did not *actually* motivate [her] discharge, or (3) that they were *insufficient* to motivate discharge." *Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994).

The magistrate judge determined that the defendants were entitled to summary judgment in this case on the plaintiff's disparate treatment claim because Russell failed to establish that similarly-situated employees outside the protected class were treated more favorably than she was. As recognized in *Carter*, however, the fact that a plaintiff is replaced by someone not in the protected class is also sufficient to satisfy the fourth prong of the *prima facie* case analysis. There is no disagreement, moreover, among the parties that Russell's replacement, Erica Spychalski, was "Caucasian, white." Thus, Russell did indeed establish a *prima facie* case of disparate treatment in this matter.

Nevertheless, the defendants articulated legitimate, nondiscriminatory reasons for the plaintiff's discharge, reasons focusing on Russell's failure to remove a patient's sutures at the direction of a physician and the plaintiff's failure to follow orders about how medication was to be administered to another student patient. Consequently, in an effort to prevail on her disparate treatment claim, Russell now argues that those articulated reasons were pretextual only and masked a prohibited discriminatory intent.

She first insists that the articulated bases for her discharge had no factual foundation. According to the plaintiff, she did not *refuse* to remove sutures from a patient; she simply sought to require that the clinic's records be changed to reflect that the procedure would be performed by a nurse rather than by a physician. Likewise, she argues that Dr. Mills never instructed her to deliver certain medicine intravenously and, in fact, that clinic procedures mandated *intramuscular* injections for the prescribed dosages of such medications.

But, even if Russell is correct in these characterizations, they are not sufficient to defeat summary judgment on this claim. Under this circuit's "modified honest-belief doctrine," "for an employer to avoid a finding that its claimed nondiscriminatory reason was pretextual, 'the employer must be able to establish its *reasonable* reliance on the particularized facts that were before it at the time the decision was made.'" *Wright v. Murray Guard, Inc.*, 455 F.3d 702, 708 (6th Cir. 2006) (emphasis added). The employee then has the opportunity to introduce contrary evidence, but the decisional process need not be optimal, only reasonably informed and considered. *See id.* In this matter, regardless of the semantics used by the plaintiff, even Regina Russell herself does not deny that she did not actually remove a particular patient's sutures when directed to do so by Dr. Mills. Consequently, she is unable to advance any evidence indicating that the defendant university did not have an honest belief that Russell refused to comply with a directive given by the medical caregiver ultimately responsible for the patient's well-being.

Similarly, the defendant employer had sufficient information before it reasonably to rely upon facts indicating that the plaintiff chose to disregard the medical directive concerning the type of injection to be given another clinic patient. The validity of the doctor's account of the dispute was lent even more credence by the fact that the doctor himself was forced to alter his records to reflect the plaintiff's different injection method, a change that ultimately led to a reprimand *of the doctor* also. In short, Russell has offered no evidence indicating that the defendants made the termination decision on grounds other than those offered or that the defendants did not reasonably

believe that the plaintiff twice failed to comply with direct orders given by the physician responsible for the care of patients being treated by him.

Russell also argues that the two identified acts of insubordination did not actually motivate the discharge decision. Rather, she claims that numerous other experiences at the medical center, when taken together, establish that invidious discrimination must have been the true impetus for the adverse employment decision. For example, Russell alleges that she was forced to use a desk in the back of the clinic, that other Student Medical Center employees openly surmised that she must have obtained her job through affirmative action initiatives, that she was denied leave time for university functions that was granted to white employees, and that her workspace was "trashed" by other nurses while Russell was on vacation.

These incidents, however, either singularly or in tandem, are insufficient to establish racial animosity at the Student Medical Center. First, uncontradicted evidence in the record established that the nurses at the student health center did not have assigned desks, although they may well have routinely used certain work stations. Second, even had the desks been "assigned," no testimony was offered during any deposition that desks other than the station in the rear of the facility were available at the time Russell was hired in 1992.

Similarly, comments from other employees shortly after Russell's hire that she would not have received the job but for the university's adherence to affirmative action principles are irrelevant when deciding whether those employees' *superiors* were racially motivated when firing the plaintiff 13 years later. Likewise, statements made by other nurses that Russell was not a pleasant co-worker do not necessarily indicate discriminatory animus sufficient to create a genuine factual issue. In fact, such comments are more likely expressions of the frustration that other health center employees felt as a result of Russell's reluctance to perform certain menial tasks and her habit of requesting Fridays off (and thus foreclosing the possibility that other nurses could enjoy three-day weekends) and then showing up at work anyway.

The record before this court also contains no evidence and no indication that denials of Russell's requests for leave time to attend diversity committee meetings or continuing education events were racially motivated. Instead, the plaintiff's supervisor explained that staffing considerations mandated that certain individuals with more advanced training be available at the center during evening hours and that Russell not be absent from the facility during other patient hours due to the illnesses, pregnancies, or other unavoidable absences of other employees.

Other alleged instances of racially discriminatory treatment highlighted by the plaintiff are even less indicative of an improper purpose behind the defendants' employment decision. For example, Russell's complaints about trash at her work station when she returned from vacations were clearly overreactions to innocent behavior. Investigations of the plaintiff's complaints regarding the condition of "Module A Nursing Station" resulted in the following explanatory memorandum from Norine Wasielewski to Russell on July 22, 2004:

> Upon investigation into your incident report of July 13, 2004, I have found that there was one water bottle and one soda can inadvertently left on the desk opposite your customary workstation and no ill intent noted by the staff member in question. While it is preferable for all employees to leave a workstation in good order, this is an unfortunate result of what was an extremely busy day.
>
> The staff member working at that desk was covering for you while you were scheduled off on vacation from July 12th to July 16th and was unaware that you were working the next day. Given this information, I am unsure as to how the staff

members [sic] behavior could be construed as harassment when you were not expected to return from vacation on the day in question.

By memorandum of January 12, 2005, Wasielewski reiterated, in regard to another complaint from Russell:

> While it is preferable for all employees to leave a nursing station just as they found it, this is not an unusual event. There are several other offices and workstations which are shared with other Student Medical staff members as well as contingent staff. Kris Armstrong has spoke [sic] with the other individuals who worked in Module A during your absence the week of December 8, 2004 and none of them meant any intentional harm. This is an unfortunate inconvenience of sharing a workplace.

Under this second prong of the *Manzer* pretext analysis, "the plaintiff admits the factual basis underlying the employer's proffered explanation and further admits that such conduct *could* motivate dismissal." *Manzer*, 29 F.3d at 1084. Nevertheless,

> the plaintiff attempts to indict the credibility of [the] employer's explanation by showing circumstances which tend to prove that an illegal motivation was *more* likely than that offered by the defendant. In other words, the plaintiff argues that the sheer weight of the circumstantial evidence of discrimination makes it "more likely than not" that the employer's explanation is a pretext, or coverup.

*Id.* Because Russell has not adduced evidence indicating a discriminatory motive in any of the employer's actions, however, she has failed to establish pretext under this scenario.

In the alternative, to satisfy the third prong of the *Manzer* pretext analysis framework, the plaintiff must show that the employer's proffered reasons for the challenged employment action were insufficient to motivate that discharge. Such a showing "ordinarily[ ] consists of evidence that other employees, particularly employees not in the protected class, were not fired even though they engaged in substantially identical conduct to that which the employer contends motivated its discharge of the plaintiff." *Id.* As this court held in *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352 (6th Cir. 1998):

> [T]o be deemed "similarly situated" in the disciplinary context, "the individuals with whom the plaintiff seeks to compare his/her treatment must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *Mitchell [v. Toledo Hosp.]*, 964 F.2d [577, 583 (6th Cir. 1992)].

Russell has failed to establish, however, that any other employees of the Student Medical Center were so similarly situated. In its memorandum opinion, the district court correctly explained why this was so:

> Plaintiff claims she was similarly-situated to: (1) Defendant Armstrong, a Caucasian employee, who was not displaced for failing to properly triage a patient in 2004 or rupturing a patient's ear drum; (2) Elizabeth Graflin, a Caucasian employee, who obtained medical treatment for her spouse in contradiction to Student Medical Center policy; (3) Gay Trace, a Caucasian employee, who placed a patient in a treatment room and left for the day without informing anyone about the patient's whereabouts; and (4) Colleen Yoder, a Caucasian employee [who] was given flexible time to attend class.

> The actions of each of these other employees are distinguishable from Plaintiff's actions. The Record indicates a long history of complaints about Plaintiff's work performance and attitude, as well as multiple disciplinary actions, such as written warnings, suspensions, working suspensions, and eventually termination. There is no indication Armstrong, Graflin, Trace or Yoder had similar histories of discipline. . . . Clearly, there exist differentiating circumstances which distinguish Plaintiff's conduct from that of the other employees, including Plaintiff's extensive history of poor performance. Therefore, Armstrong, Graflin, Trace and Yoder are not similarly situated to Plaintiff, and Plaintiff cannot prove Defendants' legitimate nondiscriminatory reason was insufficient to terminate her employment.

Russell asserts that the other employees' lack of prior disciplinary records, in and of itself, establishes that she was treated differently than Caucasian employees. The explanation for the lack of prior disciplinary records for Armstrong, Graflin, Trace, and Yoder, however, is simply the stark absence of evidence that those individuals had engaged in improper conduct prior to the incidents emphasized by Russell. Again, that fact alone means that the plaintiff was not similarly situated to the individuals with whom she seeks to compare herself.

**Hostile Work Environment**

Russell also submits that she was subjected to a hostile work environment at the Student Medical Center solely because of her race. In her brief on appeal, Russell asserts that hostility was manifested in numerous ways – "general hostility and unfriendliness, isolation, disparate discipline, adverse evaluations, non-accommodation of University-sponsored committee activities, and inferior work hours, assignments, and workspace." Clearly, illegal discrimination may be found when a plaintiff establishes that "the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993). In order to establish such a hostile work environment claim, a plaintiff must demonstrate that (1) she is a member of a protected class; (2) she was subject to unwelcomed harassment; (3) the harassment was based on her race; (4) the harassment created a hostile work environment; and (5) the employer failed to take reasonable care to prevent and correct any harassing behavior. *See Williams v. Gen. Motors Corp.*, 187 F.3d 553, 560-61 (6th Cir. 1999).

The applicable "test for a hostile work environment has both objective and subjective components." *Id.* at 566. As the Supreme Court noted in *Harris*:

> Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment – an environment that a reasonable person would find hostile or abusive – is beyond Title VII's purview. Likewise, if the victim does not subjectively perceive the environment to be abusive, the conduct has not actually altered the conditions of the victim's employment, and there is no Title VII violation.

*Harris*, 510 U.S. at 21-22.

On appeal, Russell argues that she has established at least a *prima facie* case of hostile-work-environment discrimination and that summary judgment should not have been granted in the defendants' favor on this cause of action. Again, however, the plaintiff has adduced absolutely no evidence to indicate that any of the allegedly hostile or harassing actions were in any way race-based. Indeed, the only injection of race in any of Russell's hostile work environment complaints is found in the plaintiff's assertions that fellow employees indicated that Russell must have obtained her job through affirmative action initiatives. Those isolated comments, however, were uttered many years prior to the plaintiff's termination and were neither so pervasive nor so severe as to

"amount to discriminatory changes in the terms or conditions of employment." *See Bowman v. Shawnee State Univ.*, 220 F.3d 456, 463 (6th Cir. 2000). Viewed singularly or collectively, the complaints voiced by Russell reflect more on the plaintiff's work habits and on staffing concerns at the Student Medical Center than on any racial animosity.

**Retaliation for Protected Conduct**

The plaintiff next asserts that the defendants improperly retaliated against her for two protected activities:  filing racial discrimination claims with the EEOC and speaking at a rally concerned with the university's handling of diversity issues.  To establish a *prima facie* claim of Title VII retaliation, a plaintiff must show that:

> (1) she engaged in activity protected by Title VII; (2) this exercise of protected rights was known to the defendant; (3) defendant thereafter took adverse employment action against the plaintiff, or the plaintiff was subjected to severe or pervasive retaliatory harassment by a supervisor; and (4) there was a causal connection between the protected activity and the adverse employment action or harassment.

*Morris v. Oldham County Fiscal Court*, 201 F.3d 784, 792 (6th Cir. 2000) (emphasis in original removed).

The burden of establishing a *prima facie* case is not an onerous one and is easily satisfied. *See Nguyen v. City of Cleveland*, 229 F.3d 559, 563 (6th Cir. 2000).  Once the *prima facie* case is established, the burden of production then shifts to the employer who must articulate a legitimate, nondiscriminatory reason for its actions. *See Morris*, 201 F.3d at 793. "The plaintiff, who bears the burden of persuasion throughout the entire process, then must demonstrate that the proffered reason was not the true reason for the employment decision." *Id.* (citations and internal quotation marks omitted).

Despite the relative ease with which a *prima facie* case can be established, the magistrate judge and the district judge concurred in this matter that Russell failed to prove that the defendants were aware of the plaintiff's presence at a public rally or that there was a causal connection between either the rally participation and the termination or the EEOC filings and the termination.  Indeed, Russell offered no evidence that the defendants were aware of her February 18, 2005, speech at the rally other than her assertion that the function was publicized and covered by the press.  As noted by the defendants, however, the press release concerning the rally never mentioned Russell by name or otherwise alluded to her participation.

The defendants were, nevertheless, clearly aware that Russell had filed charges with the EEOC in September 2004.  Indeed, at a meeting held during that month, McElfresh explicitly stated that his office was in charge of coordinating the defendants' response to the allegations of discrimination made by he plaintiff.  He further cautioned Dr. Weiss and Dr. Mills "to be very clear on their instructions to [the plaintiff].  If she had questions, to resolve any questions that she had.  And that if they had any problems as far as a refusal to perform some function, to contact my office."

Even assuming that Russell established her *prima facie* case by showing a causal connection between her protected activity and her termination, the record contains no evidence to refute the claim that the defendants would still have fired Russell for the stated, justifiable reasons of "failure of good behavior, gross insubordination, and neglect of duty."  The appellate record is replete with evidence of the plaintiff's numerous, substantiated violations of policy and of the progressive disciplinary steps that had been undertaken in an effort to correct such behavior.  In the face of the February 15, 2005, transgressions by Russell, the defendants were justified in pursuing the drastic measures that led to the plaintiff's dismissal.  Consequently, the plaintiff has failed to adduce

sufficient evidence that she would not have been terminated even absent her protected activities, that the stated reasons for the termination were not the true justifications for the employment action, and, thus, that the district court's grant of summary judgment on her retaliation claim was not proper.

## Section 1983[1]

The final issue Russell raises on appeal challenges the district court's determination that the plaintiff's section 1983 claim must be dismissed because Russell failed to sue any defendants in their individual capacities. The legal principle is now well-established that "[s]ection 1983 provides a federal forum to remedy many deprivations of civil liberties, but it does not provide a federal forum for litigants who seek a remedy against a State for alleged deprivations of civil liberties." *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 66 (1989).

In count four, the plaintiff alleges that only "*Defendant University*[, an arm of the state,] has, under color of regulation, custom and usage, thereby subjected Plaintiff to deprivation of rights and privileges secured by the laws of the United States in violation of her rights under 42 U.S.C. § 1983." (Emphasis added.) Nevertheless, she claims on appeal that she has sued all defendants, in both their official and individual capacities, in that cause of action, mainly because the first paragraph of count four incorporates all previous allegations and one paragraph in a preceding count mentions the individual defendants by name.

This argument is, however, unpersuasive. Examination of the complaint as a whole establishes that the plaintiff knows how to include all defendants in those counts of the complaint meant to apply to all defendants. For example, count two refers to improper actions by the "Defendant University and Defendants, Wasielewski, Armstrong and Mills"; count five refers to a conspiracy among "Defendants McElfresh, Wasielewski, Armstrong and Mills"; and counts six and seven both allege state law violations by "Defendants The University of Toledo, McElfresh, Wasielewski, Armstrong and Mills." The limitation in count four to the "Defendant University" must, therefore, be taken as indicative of Russell's intentions and, consequently, supports the dismissal of the claim by the district court.

## *CONCLUSION*

Confronted with the reality that she had been terminated from her position at the University of Toledo's Student Medical Center, Regina Russell claimed that the adverse employment action must have been the result of illegal racial discrimination. However, the plaintiff has failed to put forth any evidence that would create a genuine issue of material fact disputing the district court's conclusion that the termination resulted from Russell's "failure of good behavior, gross insubordination, and neglect of duty." It follows that the district court correctly entered judgment in favor of the defendants as a matter of law, and we therefore AFFIRM the district court's judgment.

---

[1] Even though count four of Russell's complaint purports to allege a "[v]iolation of 42 U.S.C. § 1981," the actual allegation of that count refers only to 42 U.S.C. section 1983. Thus, we treat this claim as a section 1983 cause of action.