**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
**File Name: 08a0592n.06**
**Filed: October 2, 2008**

**No. 07-4419**

**UNITED STATES COURT OF APPEALS**
**FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| SONJIA R. LINDSEY, | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | ON APPEAL FROM THE UNITED |
| v. | ) | STATES DISTRICT COURT FOR THE |
| | ) | NORTHERN DISTRICT OF OHIO |
| WHIRLPOOL CORPORATION, | ) | |
| | ) | |
| Defendant-Appellee. | ) | |
| | ) | |

Before: CLAY and GRIFFIN, Circuit Judges; and STAFFORD,[*] District Judge.

CLAY, Circuit Judge. Plaintiff-Appellant, Sonjia R. Lindsey, appeals from the district court's grant of summary judgment in favor of Defendant-Appellee, Whirlpool Corporation, on Plaintiff's racially hostile work environment, disparate treatment, constructive discharge, and unlawful retaliation claims, brought pursuant to Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq*. (2000), and the Ohio Civil Rights Act, Ohio Rev. Code § 4112

---

[*] The Honorable William H. Stafford, Jr., United States District Court for the Northern District of Florida, sitting by designation.

(2002).[1]  For the reasons set forth below, we hereby AFFIRM the district court's grant of summary

judgment in favor of Defendant.

## FACTUAL BACKGROUND

### I.        Alleged Incidents of Racial Harassment

Plaintiff, an African-American female, was an employee at Defendant's Findlay, Ohio

dishwasher and range manufacturing facility for nineteen years.  When Plaintiff began working for

Defendant in 1986, she was assigned to the general labor line.  By the time the events at issue took

place, Plaintiff had been reassigned to the dishwasher line, where she served as a backup line

stocker, providing supplies to those on the line.  In this position, she was supervised by Jenni Hanna

("Hanna"), a line manager, and Doug Miller ("Miller"), the overall manager for the dishwasher line.

Dana Abbott ("Abbott"), one of Plaintiff's co-workers, served as the coordinator of the line on which

Plaintiff worked.  The coordinator, while not acting in a supervisory capacity, is charged with

---

[1]The Ohio Civil Rights Act mirrors Title VII in all relevant respects for Plaintiff's discrimination and retaliation claims.  *See* Ohio Rev. Code § 4211; *Russell v. Univ. of Toledo*, 537 F.3d 596, 604 (6th Cir. 2008); *Hawkins v. Anheuser-Busch, Inc.*, 517 F.3d 321, 332 (6th Cir. 2008); *Staunch v. Continental Airlines, Inc.*, 511 F.3d 625, 631 (6th Cir. 2008).  Accordingly, we analyze Plaintiff's claims exclusively under a Title VII analysis, with the understanding that Plaintiff's success or failure in establishing a right to relief under Title VII necessarily would entail the conclusion that Plaintiff's claims must either succeed or fail under Ohio law as well.  *See*, *e.g.*, *Russell*, 537 F.3d at 604 (finding that the plaintiff's claims of racial discrimination under Title VII and the Ohio Civil Rights Act "may be analyzed together . . . because 'Ohio's requirements are the same as under federal law'" (quoting *Carter v. Univ. of Toledo*, 349 F.3d 269, 272 (6th Cir. 2003))).

ensuring that the line is running smoothly. The coordinator has no authority to discipline fellow line employees.

According to Plaintiff, she was harassed by her co-worker Abbott on several occasions during 2003 and 2004. Plaintiff claims that, beginning in October of 2003, Abbot would follow her around the plant, verbally abuse her, make comments about her body, and generally seek to "antagonize and intimidate" her. (J.A. 10) On one occasion, as Plaintiff was preparing to leave work, Abbott allegedly asked Plaintiff about the color of her purse, inquiring "[W]hy do you have a black purse, why don't you have a white purse?" (J.A. 82) Plaintiff claims that, given the context, she found the comment to have racial overtones.[2] Plaintiff never reported this incident or any other alleged incidents of harassment during this time period to her supervisors.[3]

According to Plaintiff, Abbott's alleged harassment continued into 2004, culminating in an incident which occurred in March or April of that year. As Plaintiff was walking up to her position on the line one day, Abbott, who was stationed directly across from her, said, "Oh, it just got awfully dark in here. Oh, hi, Sonjia." (J.A. 70) Plaintiff responded by asking whether Abbott's comment was racial. While Abbott initially remained silent, he eventually answered Plaintiff by saying that

---

[2]In fact, Plaintiff maintained during her deposition that given her ongoing "conflict" with Abbott, she believed the comment to be racist on its face. (J.A. 83-84)

[3]While Plaintiff alleges in her complaint that she reported these incidents to Miller, she admitted in her deposition that she did not contact anyone about this harassment until the incident in March of 2004. (J.A. 84, 97)

"he was not a racist so he couldn't have made a racial comment." (J.A. 70)  When Plaintiff inquired further as to why Abbott would make such a comment and indicated that she would be reporting the comment to Hanna, Abbott "reached across the line to act like he was going to punch [Plaintiff] in the face." (J.A. 71)  Plaintiff claims that Abbott then took out the small string used to tie his apron and attempted to hit Plaintiff with it from across the assembly line.  Plaintiff explained during her deposition that she interpreted Abbott's actions as an attempt to simulate "[b]eating [her] like a slave[.]" (J.A. 75)  Plaintiff asked Abbott to stop, and, when he did not, Plaintiff grabbed the apron string, put it on her chair, and sat on it.  Abbott then came around from the other side of the line and forcibly lifted up Plaintiff's leg in an attempt to get the string off of the chair.  Plaintiff resisted, but when Abbott returned to his station she eventually returned the apron tie to him.  Plaintiff alleges that she considered this physical contact to constitute "sexual harassment."

Plaintiff immediately reported this incident to her supervisor Hanna, who informed Plaintiff that she "would take care of it and that [Plaintiff] was not to talk about it." (J.A. 90)  Hanna then promptly conducted an investigation, interviewing Abbott and other line employees.  Abbott admitted to Hanna that he had made a comment substantially similar to that alleged by Plaintiff, but claimed that he made the comment because Plaintiff had yawned while walking up to the line.  Abbott also admitted to "joking around with the string," but claimed that Plaintiff "was laughing, so he did not think there was a problem." (J.A. 127)  Two other employees who had witnessed the incident, Tana Taylor ("Taylor") and Roger Kear ("Kear"), confirmed that Abbott had made the alleged comment, but indicated that he had immediately stated that he made the remark because

Plaintiff had yawned. Taylor and Kear also indicated that "Abbott and [Plaintiff] were playing with the string." (J.A. 127)

After conducting her investigation, Hanna called both Plaintiff and Abbott into her office. She reminded them that "Whirlpool does not tolerate any racial slurs or insinuations." (J.A. 127) After Abbott indicated that he understood this, Hanna requested Plaintiff "to make sure that if she hears anyone make a comment, which she feels is inappropriate, that she notify her supervisor immediately." (J.A. 127) Hanna assured Plaintiff that she should not have any problems from Abbott again. Both Plaintiff and Abbott indicated that they understood the outcome and that they considered the case resolved. According to Plaintiff, she never heard any more racial comments from Abbott, but claims that he did continue to follow her around the factory and give her "dirty looks." (J.A. 108)

In addition to these alleged incidents of harassment from Abbott, Plaintiff also claims that, sometime in 1996, she was harassed by an exam proctor employed by Whirlpool on a contractual basis to administer employment tests. In particular, Plaintiff, although she "[couldn't] 100 percent remember" the specifics of the event, recalled that the exam proctor instructed Plaintiff to identify herself on exam forms as a "Negro." (J.A. 85-86) Plaintiff complained about this proctor to Sandy Franks ("Franks") in Defendant's Human Resources Department ("HRD"). Franks investigated the matter, apologized to Plaintiff on behalf of Whirlpool, and indicated that the proctor would be reprimanded. Four years later, however, Plaintiff recalled that the same proctor allegedly made the

same comments to Plaintiff again when she was taking another test. Plaintiff again complained to the HRD. After investigating the incident, Defendant decided not to use that proctor for tests ever again.

## II.    Alleged Incidents of Disparate Treatment

Plaintiff also alleges two separate incidents of disparate treatment on account of her race. First, Plaintiff claims that, in October of 2003, Defendant did not invite her to attend a supplemental Saturday training session which would have garnered her overtime pay, despite inviting white employees to attend the training session. In her deposition, however, Plaintiff acknowledged that she did receive the original training, she was informed that she did not need additional in-person training, and she was able to perform her job without the additional training.

Second, Plaintiff claims that, in April of 2004, she was unfairly required to take a vacation day in order to "shadow" a Whirlpool employee. At the time, Plaintiff was taking a local business administration class, unrelated to her employment at Whirlpool. As part of that course, Plaintiff was required to "shadow" somebody in the business field and submit a report about the experience. When Plaintiff asked if she could shadow someone in the HRD, she was initially informed that "it wouldn't be a problem, that what Whirlpool normally did was find a replacement for [her] on the line," and that she just needed to get approval from her supervisor. (J.A. 61) The next day, however, Plaintiff was informed by Miller, her supervisor, that "if [she] wanted to do a shadowing experience, then [she] had to do it on [her] own time." (J.A. 62) In other words, Miller told her that she would

need to take a vacation day in order to shadow someone in the HRD. In light of this information, Plaintiff waited for a day when the line was shut down in order to fulfill her shadowing requirement. Although Plaintiff claims that other employees who were caucasian were allowed to shadow Whirlpool employees without taking vacation days, she admitted in her deposition that she did not have any personal knowledge of their situations.

### III. Alleged Retaliation and Constructive Discharge

After experiencing this alleged racial harassment and discrimination, Plaintiff began to suffer depression and mental anxiety. On April 19, 2004, Plaintiff took medical leave from her position, and subsequently filed a claim for short term disability benefits. On May 28, 2004, however, Unicare, the third-party administrator of Whirlpool's employee benefits, denied Plaintiff's application for disability benefits because Plaintiff had not submitted proper documentation to support her claim that she was disabled. Almost a month later, on June 26, 2004, Plaintiff filed a claim with the Equal Employment Opportunity Commission ("EEOC") alleging racial harassment and discrimination.

In October of 2004, Plaintiff's personal physician released Plaintiff to return to work from medical leave. Pursuant to Defendant's policies, Plaintiff also needed to be cleared by one of Defendant's physicians before returning to work. After examining Plaintiff, Defendant's physician felt that she was not ready to return to work and ordered an additional sixty days of medical leave.

Plaintiff alleges that Whirlpool prevented her from returning to work as retaliation for her filing a claim with the EEOC.

At the end of this additional sixty-day period, it appears that Plaintiff's personal physician refused to sign another release form to permit Plaintiff to return to work. Notwithstanding this dispute over the release form, Defendant sent Plaintiff a letter on December 29, 2004, indicating that it had been unable to contact her by phone and requesting Plaintiff to contact Defendant to discuss her return to work. The letter also indicated that, if Plaintiff did not contact Defendant within three calendar days of receiving the letter, Defendant would assume that she had voluntarily quit. Although Plaintiff was not able to comply with this three-day time limit, she ultimately returned to work on January 17, 2005.

Upon her return to work, Plaintiff claims that Miller and Hanna gave her "dirty looks," and that Abbott "star[ed]" at her as she passed by him. (J.A. 103, 105) Plaintiff also alleges that she was the last person to receive a job assignment for the day. When the shift coordinator for that day, an African-American woman named Susie Lawson ("Lawson"), reached Plaintiff's name on the assignment list, Plaintiff claims that she stated, "And now for you, Ms. Thang." (J.A. 103) According to Plaintiff, Lawson's statement was akin to "calling [her] a bitch," and she was greatly disturbed. (J.A. 104) In fact, Plaintiff was so emotionally upset that she "couldn't take being there" and had to leave work "a half hour or so" later. (J.A. 105-06) Over the next several weeks, Plaintiff

remained out on unpaid vacation. Finally, on March 2, 2005, Plaintiff returned to the plant to inform

Defendant's HRD of her resignation.

## PROCEDURAL BACKGROUND

On July 19, 2005, a few months after Plaintiff resigned, the EEOC issued her a right to sue

letter. On October 18, 2005, Plaintiff filed a *pro se* complaint against Defendant in the United States

District Court for the Northern District of Ohio, alleging claims of racial harassment, disparate

treatment, constructive discharge, and unlawful retaliation, and seeking $250,000 in monetary

damages.

On December 28, 2006, Defendant filed a motion for summary judgment with respect to all

of Plaintiff's claims. On March 5, 2007, Francis J. Landry was appointed *pro bono* counsel for

Plaintiff. Shortly thereafter, on May 17, 2007, Plaintiff filed a response to Defendant's motion for

summary judgment.

On July 9, 2007, the magistrate judge issued a Report and Recommendation suggesting that

Defendant's motion for summary judgment be granted. On September 19, 2007, after considering

Plaintiff's objections, the district judge adopted the magistrate judge's Report and Recommendation

in full, granted Defendant's motion for summary judgment, and dismissed the case. *Lindsey v.

Whirlpool*, No. 3:05 CV 7401, 2007 WL 2769635, at *3 (N.D. Ohio Sept. 19, 2007).

On October 18, 2007, Plaintiff, assisted by counsel, filed a timely notice of appeal. On appeal, Plaintiff has returned to proceeding *pro se* and challenges all the aspects of the district court's opinion.

**ANALYSIS**

**I.      Standard of Review**

This Court reviews a district court's grant of summary judgment *de novo*. *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 389 (6th Cir. 2008). Summary judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A genuine issue of material fact exists when there are "disputes over facts that might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). However, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting *First Nat. Bank of Arizona v. Cities Servs. Co.*, 391 U.S. 253, 289 (1968)).

At the summary judgment stage, the moving party bears the initial burden of identifying those parts of the record which demonstrate the absence of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). However, if the moving party seeks summary judgment

on an issue for which it does not bear the burden of proof at trial, the moving party may meet its initial burden by showing that "there is an absence of evidence to support the nonmoving party's case." *Id*. at 325. When the moving party has carried forward this burden, "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586. The non-moving party may not rest upon its mere allegations or denials of the adverse party's pleadings, but rather must set forth specific facts showing that there is a genuine issue for trial. *Id*.; *accord* Fed. R. Civ. P. 56(e)(2). The non-moving party must present significant probative evidence in support of its opposition to the motion for summary judgment. *Moore v. Philip Morris Companies, Inc.*, 8 F.3d 335, 339-340 (6th Cir.1993).

After the parties have presented the evidence, "the judge's function is not himself to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. In evaluating the evidence, the court must draw all inferences in the light most favorable to the non-moving party. *Matsushita,* 475 U.S. at 587. However, "the mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient [to defeat a motion for summary judgment]; there must be evidence on which the jury could reasonably find for the" non-moving party. *Anderson*, 477 U.S. at 252.

## II.      Hostile Work Environment

Title VII's anti-discrimination provision makes it "an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms,

conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). This provision "affords employees the right to work in an environment free from discriminatory intimidation, ridicule, and insult," *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 65 (1986), and thus prohibits conduct which is "sufficiently severe and pervasive [as] to alter the conditions of the victim's employment and create an abusive working environment." *Id*. at 67 (internal quotation marks omitted); *accord Faragher v. City of Boca Raton*, 524 U.S. 775, 786 (1998); *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993). To establish a *prima facie* case[4] of a hostile work environment, a Title VII plaintiff must demonstrate that: (1) she is a member of a protected class; (2) she was subjected to unwelcome racial harassment; (3) the harassment was based on plaintiff's protected status; (4) the harassment unreasonably interfered with

---

[4]As with other single-motive Title VII discrimination claims, hostile work environment claims are subject to the tripartite burden-shifting analysis first announced by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), and subsequently modified in *Texas Dept. of Comm. Affairs v. Burdine*, 450 U.S. 248 (1981). *See Clay v. United Parcel Service, Inc.*, 501 F.3d 695, 706 (6th Cir. 2007). Under this *McDonnell Douglas* framework, a Title VII plaintiff seeking to prove a claim of single-motive discrimination by means of circumstantial evidence must survive a series of shifting burdens of production:

> First, the plaintiff has the burden of proving by the preponderance of the evidence a *prima facie* case of discrimination. Second, if the plaintiff succeeds in proving the *prima facie* case, the burden shifts to the defendant "to articulate some legitimate, nondiscriminatory reason for the employee's rejection." Third, should the defendant carry this burden, the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.

*Burdine*, 450 U.S. at 252. In order to survive a defendant's motion for summary judgment, the single-motive Title VII plaintiff must produce sufficient evidence to overcome these burdens of production.

the plaintiff's work performance by creating an environment that was intimidating, hostile, or offensive; and (5) the employer knew or should have known about the harassing conduct but failed to take corrective action. *See Bailey v. USF Holland, Inc.*, 526 F.3d 880, 885 (6th Cir. 2008); *Grace v. USCAR*, 521 F.3d 655, 678 (6th Cir. 2008); *Clay v. United Parcel Service, Inc.*, 501 F.3d 695, 706 (6th Cir. 2007); *Newman v. Fed. Express Corp.*, 266 F.3d 401, 405 (6th Cir. 2001).

With respect to this fourth element, the Supreme Court has clarified that in order to be actionable, the hostile work environment "must be both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so." *Faragher*, 524 U.S. at 787. To determine whether an environment is sufficiently hostile or abusive, a court must consider "all of the circumstances," including the "frequency of the discriminatory conduct, its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris*, 510 U.S. at 23. The harassment "must be extreme to amount to a change in the terms and conditions of employment." *Faragher*, 524 U.S. at 788. "[S]imple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." *Id*. (internal quotation marks and citation omitted).

In the instant case, Plaintiff claims that Abbott's racial comments as well as the exam proctor's actions created a hostile work environment. Given the record, it appears that Plaintiff has established the first three elements of her *prima facie* case for this claim: she is a member of a

protected class who appears to have been subject to harassment based upon her race. While Defendant argues that Plaintiff has not demonstrated that Abbott's comments were racial, we conclude that there is at least a question of material fact as to whether a reasonable jury could infer that Abbott's were racially motivated. Additionally, even if Abbott's comments cannot be reasonably construed as racial, the exam proctor's comments certainly constitute a basis for alleging racial harassment.

However, while Plaintiff has satisfied the first three elements of her *prima facie* case, we agree with the district court that she has failed to demonstrate that this alleged racial harassment created a hostile work environment. Although Plaintiff found Abbott's comments to be subjectively offensive, it is not clear that such comments would be objectively offensive to a reasonable person. Moreover, Plaintiff has not produced any evidence to suggest that either Abbott's or the exam proctor's comments affected a term, condition, or privilege of her employment. Plaintiff does not allege that she was hindered from performing her duties as a result of either Abbott's or the exam proctor's comments. Instead, these racial comments, while certainly unacceptable, appear to be isolated incidents which are not, in themselves, severe and pervasive enough to constitute a hostile working environment. *See, e.g., Bowman v. Shawnee State Univ.*, 220 F.3d 456, 463 (6th Cir. 2000) ("Isolated incidents . . . unless extremely serious, will not amount to discriminatory changes in the terms or conditions of employment."); *see also Clark v. United Parcel Service, Inc.*, 400 F.3d 341, 351-52 (6th Cir. 2005) (finding that a manager's routine telling of sexual jokes over a period of two

years did not amount to severe and pervasive conduct sufficient to create a sexually hostile work environment).

Finally, even if we were to find Abbott's and the exam proctor's comments severe enough to have created a hostile work environment, Plaintiff has failed to establish Defendant's liability for such harassment. The Supreme Court has directed that an employer can avoid liability for a hostile work environment created by a plaintiff's co-worker if "the employer exercised reasonable care to prevent and correct promptly any [racially] harassing behavior" or if "the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." *Faragher*, 524 U.S. at 807; *see also Bailey*, 526 F.3d at 885 (indicating that, to prevail on a hostile work environment claim, a plaintiff must demonstrate that "the employer knew or should have known about the harassing conduct but failed to take corrective or preventative action"). The record in this case reflects that, when Plaintiff informed her supervisors of the racially discriminatory comments made by Abbott and the exam proctor, these supervisors took corrective action promptly. For instance, Hanna quickly investigated Abbott's comment and actions, called both Plaintiff and Abbott into her office, and explained that such comments and behavior would not be tolerated. Likewise, the HRD apologized to Plaintiff for the exam proctor's actions, reprimanded the exam proctor, and eventually dismissed the exam proctor when another incident occurred. In short, once informed of potential harassment, Defendant took the allegations seriously, and seems to have successfully corrected the problem.

Because we conclude that Plaintiff has failed to demonstrate a *prima facie* case of a racially hostile work environment, we affirm the district court's grant of summary judgment in favor of Defendant on this claim.

## III.     Disparate Treatment

In addition to prohibiting the creation of a hostile work environment, Title VII also expressly prohibits employers from treating employees differently according to their race. *See* 42 U.S.C. § 2000e-2(a)(1). For single-motive discrimination claims, a plaintiff seeking to establish a *prima facie* case of disparate treatment must demonstrate that: (1) she is a member of a protected class; (2) she was qualified for her job; (3) she suffered an adverse employment action; and (4) she was replaced by a person outside the protected class or treated differently than similarly situated non-protected employees. *See Russell v. Univ. of Toledo*, 537 F.3d 596, 604 (6th Cir. 2008); *Arendale v. City of Memphis*, 519 F.3d 587, 603 (6th Cir. 2008). In this case, however, Plaintiff appears to have asserted a mixed-motive claim, because she alleges only that her race was a motivating factor for Defendant's denial of supplemental training and refusal to let her shadow an HRD employee during work hours. *See Lindsey*, 2007 WL 2769635, at *9. In such a case, when a plaintiff alleges both legitimate and illegitimate reasons motivated the decision, Plaintiff "need only produce evidence sufficient to convince a jury that: (1) the defendant took an adverse employment action against the plaintiff; and (2) 'race, color, religion, sex, or national origin was *a* motivating factor' for the defendant's adverse employment action." *White*, 533 F.3d at 400 (quoting 42 U.S.C. § 2000e-2(m)).

Although Plaintiff's "burden of producing some evidence in support of her mixed-motive claim is not onerous," *id*., Plaintiff has failed to meet even this minimal burden. Plaintiff alleges that she was discriminated against when Defendant (1) denied her supplemental training which it provided to white employees, and (2) required her to take a vacation day in order to fulfill a shadowing requirement for a course unrelated to her employment with Defendant. Plaintiff's claims, however, fall well short of demonstrating that she suffered an adverse employment action in either of these instances.

An adverse employment action is an action by the employer that "constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Burlington Industries v. Ellerth*, 524 U.S. 742, 761 (1998); *accord White*, 533 F.3d at 402-03. Defendant's failure to provide Plaintiff with extra training does not constitute an adverse employment action under this definition. As Plaintiff herself admits, she was informed that she did not need the training, and the lack of the training did not affect her ability to perform her job or to receive benefits. Likewise, Defendant's refusal to let Plaintiff use work time to fulfill a shadowing requirement for a non-work-related business class did not alter her employment responsibilities or result in a significant change in her employment benefits. Plaintiff has not shown that she was normally allowed to use work time for non-work-related activities or that the denial of her request to use work time for shadowing altered her employment status or job duties on the dishwasher line.

Even if the Court were to conclude that Plaintiff had suffered an adverse employment action in these circumstances, Plaintiff still has failed to produce evidence to support her allegation that the decisions to deny her training and to require her to take a vacation day for shadowing were based, at least in part, upon her race. Both of these employment decisions appear to have been made by Miller, whom Plaintiff does not allege harbored any racial animus toward her. Moreover, while Plaintiff claims that white employees were allowed to participate in the extra training and were permitted to shadow employees during work time, she has not explained how these employees were similarly situated to her so as to justify an inference that her disparate treatment was based upon her race. On the contrary, she has admitted that, unlike the white employees who were provided the additional training, she did not need the training. She also has admitted that she does not have any personal knowledge of other employees who were permitted to shadow HRD personnel during their work hours, let alone any evidence to demonstrate that their shadowing experience was, like hers, non-work-related.

Because we conclude that Plaintiff has failed to produce enough evidence to convince a reasonable jury that she suffered an adverse employment action for which her race was a motivating factor, we affirm the district court's conclusion that Defendant is entitled to summary judgment on Plaintiff's disparate treatment claim.

**IV. Unlawful Retaliation**

Title VII's anti-discrimination provision makes it "an unlawful employment practice for an employer to discriminate against any of his employees . . . because [the employee] has opposed any practice made an unlawful employment practice by [Title VII] or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing" allowed for by Title VII. 42 U.S.C. § 2000e-3(a). To establish a *prima facie* case of retaliation, a plaintiff must demonstrate that: (1) she engaged in activity protected by Title VII; (2) this exercise of protected rights was known to the defendant; (3) the defendant thereafter took a materially adverse action against the plaintiff or subjected the plaintiff to severe and pervasive retaliatory harassment; and (4) there was a causal connection between the protected activity and the materially adverse action. *See Morris v. Oldham County Fiscal Court*, 201 F.3d 784, 792 (6th Cir. 2000); *Burlington Northern & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 67-68 (2006) (modifying the third element of the *prima facie* case to require a "materially adverse" action rather than an "adverse employment action"); *see also Randolph v. Ohio Dep't of Youth Services*, 453 F.3d 724, 736 (6th Cir. 2006).

In contrast to the "adverse employment action" requirement for Title VII discrimination claims, the "materially adverse action" requirement for retaliation claims "is not limited to an employer's actions that solely affect the terms, conditions, or status of employment, or only those acts that occur at the workplace." *Hawkins v. Anheuser-Busch, Inc.*, 517 F.3d 321, 345 (6th Cir. 2008); *see Burlington Northern*, 548 U.S. at 67 ("The scope of the anti-retaliation provision extends beyond workplace-related or employment-related retaliatory acts and harm."). Instead, Title VII's "anti-retaliation provision protects an individual . . . from [any] retaliation that produces an injury

or harm." *Burlington Northern*, 548 U.S. at 67. As part of demonstrating such retaliation, a plaintiff must establish that the defendant took an action that, viewed from the perspective of a reasonable employee in the plaintiff's position, was "materially adverse" to the plaintiff. *Id*. at 68. A challenged action is "materially adverse" if "it well might have 'dissuaded a reasonable worker from making or supporting a charge of discrimination.'" *Id*. (quoting *Rochon v. Gonzales*, 438 F.3d 1211, 1219 (D.C. Cir. 2006)). This determination of whether a particular action by the defendant is "materially adverse" and, thus, potentially an unlawful act of retaliation, is an inherently fact-specific inquiry that necessarily "depend[s] upon the particular circumstances" of the case. *Id*. at 69.

In the instant case, Plaintiff contends that Defendant retaliated against her for filing the EEOC complaint by: (1) denying her medical disability benefits; and (2) delaying her return to work following her disability leave. We again conclude that Plaintiff has failed to set forth a *prima facie* case of retaliation with respect to either of these contentions.

First, with regard to the denial of disability benefits claim, Plaintiff has failed to demonstrate that Defendant engaged in this action in retaliation for the filing of her EEOC complaint. Indeed, the record clearly demonstrates that Plaintiff's medical benefits were denied by Unicare, an independent entity providing insurance services to Defendant, on May 28, 2004, almost a month prior to the filing of her EEOC complaint. As such, these benefits, even if they had been denied at the instigation of Defendant—a fact for which Plaintiff has failed to adduce any proof—could not have been denied in retaliation for the subsequently filed EEOC complaint.

Second, with respect to Plaintiff's claim that Defendant's doctor improperly delayed her return to work by refusing to give her medical clearance, Plaintiff has failed to demonstrate that such an action was causally connected to the filing of her EEOC complaint. To demonstrate a causal connection between a materially adverse action—such as the delay of an employee's return to work— and the exercise of protected rights, "'a plaintiff must proffer evidence sufficient to raise the inference that [the] protected activity was the likely reason for the adverse action.'" *Michael v. Caterpillar Fin. Services Corp.*, 496 F.3d 584, 596 (6th Cir. 2007) (quoting *Dixon v. Gonzales*, 481 F.3d 324, 333 (6th Cir. 2007)). Here, Plaintiff simply alleges that, despite the doctor's indication that he felt she was not ready to return to work, he in fact was delaying her return in retaliation for the filing of her EEOC complaint. Plaintiff produces no evidence to support her claim other than the fact that her delay in returning to work occurred only a few months after the filing of her EEOC complaint. This Court's precedent is clear that mere temporal proximity between an assertion of Title VII rights and a materially adverse action, without other indicia of retaliatory conduct, is not sufficient to establish the causal connection element of a retaliation claim. *See Arendale*, 519 F.3d at 606; *Michael*, 496 F.3d at 596; *Tuttle v. Metro. Gov't of Nashville*, 474 F.3d 307, 321 (6th Cir. 2007); *Randolph*, 453 F.3d at 737; *Little v. BP Exploration & Oil Co.*, 265 F.3d 357, 363-64 (6th Cir. 2001); *Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 582-83 (6th Cir. 2000). In the absence of any other evidence to suggest that Defendant's doctor was motivated by a consideration of Plaintiff's EEOC complaint when delaying her return to work, we conclude that Plaintiff has failed to carry her

burden to set forth a *prima facie* case of retaliation. Accordingly, we affirm the district court's

conclusion that Defendant is entitled to summary judgment on Plaintiff's unlawful retaliation claim.

## V.      Constructive Discharge

Another form of racial discrimination which Title VII prohibits is the constructive discharge

of an employee. To establish a constructive discharge claim, the plaintiff must demonstrate that: (1)

the defendant deliberately created intolerable working conditions, as perceived by a reasonable

person; and (2) the defendant did so with the intention of forcing the plaintiff to quit. *Logan v.*

*Denny's, Inc.*, 259 F.3d 558, 568-69 (6th Cir. 2001) (quoting *Moore v. KUKA Welding Sys.*, 171

F.3d 1073, 1080 (6th Cir. 1999)); *accord Goldmeier v. Allstate Ins. Co.*, 337 F.3d 629, 635 (6th Cir.

2003). This analysis is inherently fact-specific and requires an inquiry into the objective feelings of

the plaintiff as well as the intent of the defendant and the reasonably foreseeable impact of the

defendant's conduct upon the plaintiff. *See Nance v. Goodyear Tire & Rubber Co.*, 527 F.3d 539,

555 (6th Cir. 2008); *Smith v. Henderson*, 376 F.3d 529, 533 (6th Cir. 2004). In particular, "[a]

constructive discharge requires a determination that 'working conditions would have been so

difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled

to resign.'" *Smith*, 376 F.3d at 533-34 (quoting *Held v. Gulf Oil Co.*, 684 F.2d 427, 432 (6th Cir.

1982)); *accord Nance*, 527 F.3d at 555. In determining whether a reasonable person would have felt

compelled to resign, the Court generally considers the following factors:

> (1) demotion; (2) reduction in salary; (3) reduction in job responsibilities; (4) reassignment to menial or degrading work; (5) reassignment to work under a younger supervisor; (6) badgering, harassment, or humiliation by the employer calculated to encourage the employee's resignation; or (7) offers of early retirement or continued employment on terms less favorable than the employee's former status.

*Logan*, 259 F.3d at 569 (quoting *Brown v. Bunge Corp.*, 207 F.3d 776, 782 (5th Cir. 2000)).

In the instant case, Plaintiff has failed to establish either element of a constructive discharge claim. While Plaintiff claims to have found her working conditions intolerable, it is far from clear that a reasonable person would have found Plaintiff's working conditions so difficult or unpleasant that he or she would have been compelled to quit. Indeed, none of the factors that this Court generally considers with respect to intolerable working conditions are present in this case. Plaintiff does not complain about the hours or conditions of her work on the assembly line. Nor does she claim that she was denied benefits or not compensated adequately. Rather, Plaintiff's complaint focuses on the fact that she was teased, and generally disliked, by several of her co-workers. However, this teasing occurred in discrete and isolated incidents, and was, by no means, the kind of severe and pervasive racial harassment that would cause a reasonable employee to quit.

Moreover, even if Plaintiff could demonstrate that her working conditions were objectively intolerable, Plaintiff has produced no evidence to suggest that Defendant deliberately created such working conditions with the intention of forcing Plaintiff to quit. On the contrary, Plaintiff's own deposition testimony suggests that Defendant sought to correct each one of the racially intolerable working conditions which Plaintiff brought to its attention.

In short, Plaintiff has failed to produce any evidence to support her claim that she was constructively discharged. Accordingly, we conclude that Defendant is entitled to summary judgment on this claim.

## CONCLUSION

For the foregoing reasons, we AFFIRM the judgment of the district court.