NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 10a0270n.06

No. 09-3349

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**

**Apr 30, 2010**

LEONARD GREEN, Clerk

JIMMIE BUTLER,                                )
                                             )
    Plaintiff-Appellant,               )
                                             )
    v.                                 )
                                             )
COOPER STANDARD AUTOMOTIVE, INC.,            )
                                             )
    Defendant-Appellee,                )
                                             )
TIMOTHY R. BARNHISEL,                        )
                                             )
    Defendant-Appellee.                )
                                             )

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF OHIO

BEFORE:  SILER, ROGERS, and McKEAGUE, Circuit Judges.

ROGERS, Circuit Judge.  Jimmie Butler appeals the district court's grant of summary judgment for Cooper-Standard Automotive and a supervisor at Cooper-Standard, Timothy Barnhisel, on Butler's claims of race discrimination, a hostile work environment, and retaliation in violation of federal and Ohio law.  The district court granted summary judgment for Cooper-Standard and Barnhisel after determining that Butler could not show that Cooper's legitimate reasons for his termination were merely pretext for racial discrimination or retaliation and that Butler had not alleged discrimination severe and pervasive enough to create a hostile work environment.  After Butler filed his initial brief before this court, Cooper-Standard filed for bankruptcy protection, triggering an automatic stay of all claims against Cooper-Standard and leaving Butler's state-law

claims against Barnhisel as the only active claims in the case.  Because Butler has not shown that Barnhisel was responsible for any adverse employment actions taken against Butler on account of race or in retaliation for Butler's claims of race discrimination, and because Butler has not developed any arguments as to why the district court erred in granting summary judgment for the defendants on Butler's hostile work environment claim, the district court properly granted summary judgment with respect to Barnhisel.

Butler was employed as a mandrel operator in Cooper-Standard's Bowling Green, Ohio plant, from June of 1996 until September of 2007, when he was terminated by the company.  Mandrels are racks of metal forms used by Cooper-Standard to shape rubber hoses for use in auto parts.  As a mandrel operator, Butler's main job duties were setting up supplies used during a shift, loading and unloading mandrels from the autoclave (a large curing oven), transporting materials to and from the autoclave, and changing racks of mandrels.  During a normal shift, mandrel operators are contractually required to complete a minimum of eighteen loads, but operators sometimes complete more, sometimes less.  Mandrel operators normally work in pools of two or three, and the general practice is that the operator with the most seniority determines the pace of the work.

Timothy Barnhisel was an employee at Cooper-Standard who eventually became a shift supervisor.  Barnhisel worked in the mandrel department as supervisor on the first shift, but Barnhisel would serve as Butler's supervisor on occasions when Butler worked overtime or when Barnhisel filled in for another supervisor on the second shift.  Butler alleges that Barnhisel discriminated against Butler and other African-American employees at the plant and that this

discrimination ultimately resulted in Butler's termination. Butler essentially makes three arguments in support of his claim that Barnhisel discriminated against him. First, Butler claims that, in an effort to get Butler to quit or be fired, Barnhisel would assign Butler to extra work whenever possible, and that the practice became so pervasive that the undesirable jobs around the plant became known as "Jimmie Jobs." Second, Butler claims that his termination was the result of discrimination by Barnhisel because Barnhisel was the supervisor on duty during one of the two incidents that the company used to support Butler's termination, and that Barnhisel further facilitated the termination by reporting Butler for minor or falsified violations of company policy, which blighted Butler's employment record. Finally, Butler claims that evidence showing that Barnhisel discriminated against other African-American employees at the plant supports the discrimination claims.

Butler alleges three incidents in which Barnhisel discriminated against other African-American employees at the plant. Michael Brownlee, an African-American employee who was then working in the finishing department, testified in his deposition that Barnhisel admonished him in 1999, before Barnhisel became a supervisor, for getting parts from the parts-washing area in the mandrel department. Although Brownlee admitted he was not supposed to get parts from that area without permission from a supervisor, he testified that he later observed Barnhisel witness another employee take parts from the area and that Barnhisel did not admonish the other employee. Brownlee also testified that in 2006, Barnhisel approached Brownlee and Sean Walker, another African-American employee, to confront Walker for not wearing safety glasses. Brownlee testified that Barnhisel had stated that Brownlee looked like he had something to say, and Brownlee

responded by asking why Barnhisel was even talking to him. When Brownlee threatened to discuss any issues between the two with management, Barnhisel said, "For what? So you can go up there and play the race card again?" Brownlee also alleged that at some point during the conversation, Barnhisel told Brownlee that he should "come back to the mandrel department so we can do you like we did Roy [Williams]."

Roy Williams was an African-American employee at Cooper-Standard who Butler believes was fired as a result of discrimination. Williams raised racial concerns two days after being disciplined for leaving his pool with overflowing baskets, and was terminated for reaching zero attendance points less than a month after the meeting to address his concerns. Although Butler alleges that Williams never received the required notification that he had reached four attendance points and there is some dispute as to whether the notification that Williams had reached four attendance points was provided in a timely fashion, Cooper-Standard provided documentation, signed by Williams, of notification that Williams had reached four and then one attendance points. After Williams was terminated, Butler was the only African-American employee in the mandrel department for five years, and there were no African-American employees in the mandrel department after Butler's termination.

In addition to these events, Butler alleged that Barnhisel discriminated against Butler personally. Butler alleged that Barnhisel would assign Butler the most undesirable jobs and extra work when Butler worked on Barnhisel's shift and that the practice became so commonplace that the most undesirable jobs became known as "Jimmie Jobs." Although several employees, including

Barnhisel claimed to have heard the term, an employee named Brock Tong claimed to have coined the phrase to refer to work around the plant that Butler refused to perform. In his own deposition, Butler testified that Barnhisel did not assign Butler jobs outside of the normal duties of a mandrel operator, and that there was always a white employee to whom Barnhisel would assign the same tasks as assigned to Butler.

Butler filed three charges of discrimination with the EEOC alleging unlawful discrimination. In August of 2006, Butler filed his first complaint with the EEOC, which stated that "[t]he supervisor harass[es] me ever[y] chance he gets," and describing an incident where Barnhisel got in Butler's face and told him to "shut the fu** up" and where Barnhisel stated that he would find a reason to send Butler home. The complaint also alleged that Barnhisel treated other African-American employees in a similar manner. At a meeting with management to address the complaint, Barnhisel apologized to Butler for telling Butler to shut up, but Barnhisel denied ever using profanity. Barnhisel also stated that he had admonished a white employee in a similar manner.

Butler filed a second charge of discrimination with the EEOC after he was called ni**** by a co-worker named Brock Tong. Butler stated that his supervisor, Chuck Hawken, was standing right there but did nothing about the incident. Tong testified at his deposition that he had called Butler a "lazy ni****" after Butler called Tong a "fu***** weasel" several times. Tong also testified that he apologized to Butler repeatedly and that he was suspended for the rest of the day after the incident and was required to watch and discuss a harassment video with a member of Cooper-Standard's human resources department.

In August of 2007, Butler and another mandrels employee named Troy Uzelac were involved in the first of two incidents that resulted in Butler's termination. After Butler and Uzelac were assigned to work in the same pool, they had a dispute about how many loads they were going to fire. According to Uzelac, they had been one short of the required minimum eighteen loads, but Butler had only wanted to complete seventeen loads that day because of a scheduled company meeting. The following day, when Uzelac and Butler again worked in the same pool, they again clashed over the number of loads they should complete. Uzelac, who had more seniority than Butler, wanted to fire more than eighteen loads but Butler wanted to do only the minimum eighteen loads. They argued, and after Uzelac claimed that Butler caused Uzelac to be burned by pushing hot mandrel bars into Uzelac's side of the pool, Uzelac threatened to "jack slap" Butler if it happened again. Uzelac reported the incident to department manager Richard Meeks, who happened to be standing nearby. Meeks organized a meeting among himself, Butler, Uzelac, Barnhisel, who was the shift supervisor at the time of the incident, and a union representative.

Following this meeting, both employees were given an "information only" employee corrective action notice in which they were told that they needed to work with other employees, do their best, improve their communication, and fire as many loads as possible. Several days later, Dewey Maynard, the plant manager, met with both employees individually in the presence of a representative from the human resources department and a representative from the union. Maynard's notes of his meeting with Butler indicate that Butler became agitated when Maynard told Butler that the plant could not have people refusing to do their best and preventing others from doing their best.

When Butler claimed that everyone was lying, Maynard told Butler that human resources had spoken with the witnesses Butler suggested and that those witnesses stated that Butler's behavior was not proper. Maynard told Butler that any further incidents would result in Butler's suspension or termination.

In September of 2007, Butler was terminated following an incident that occurred while Butler was working in a pool with Michael St. Clair and John Brose. According to St. Clair, he and Butler requested that Brose slow down so that they could perform indirect labor activities. St. Clair then testified that Brose ignored him, attempted to fire another load, and then went to get a supervisor after "Jimmie like got in his way or something." Brose testified that he originally agreed to slow down, but then proceeded to fire another load until Butler pressed the emergency stop button, which shut down the autoclave and prevented the load from firing. Butler received an employee corrective action notice for pressing the E-stop button to keep Brose from firing another load. Following an investigation, Cooper-Standard terminated Butler for interfering with the productivity of another worker. The union conducted its own investigation and determined that Cooper-Standard has just cause under the collective bargaining agreement to terminate Butler.

Following his termination, Butler filed a third EEOC complaint, claiming that he was terminated for calling a co-worker a crybaby and stating that an employee who had previously called him a ni**** had received no discipline. Butler's complaint stated that Butler felt he had been terminated in violation of the Civil Rights Act of 1964. Butler then filed this lawsuit against Barnhisel, Cooper-Standard, and Brock Tong, alleging violations of both Ohio and federal law for

race discrimination, retaliation, and a hostile work environment. Although Butler originally brought both Title VII and state-law claims against Barnhisel, Butler dropped his Title VII claims against Barnhisel, and all of the claims against Brock Tong. Count Three of Butler's complaint, which contained the state-law claims against Barnhisel, alleged that "Defendants imposed additional burdens upon [Butler] in his employment, required him to endure a hostile work environment and terminated his employment on the basis of his race, all in violation of Ohio law, including, but not limited to Sections 4112.02(A) and 4112.99 *Revised Code*."

Cooper-Standard and Barnhisel moved for summary judgment on all claims and the district court granted the motion in a memorandum opinion. The court determined that Butler had not created a question of fact as to whether race played a role in his termination or any other adverse employment decision, that Butler had not presented any evidence that Cooper-Standard's legitimate reason for Butler's termination was merely pretext for discrimination, and that Butler had not alleged sufficient racial harassment to create a hostile work environment based on a single racial slur Butler experienced while working at Cooper-Standard. Butler filed this timely appeal. While this appeal was pending, Cooper-Standard filed for Chapter 11 bankruptcy protection. Cooper-Standard filed notice with this court that the automatic stay protecting Cooper-Standard from prosecution of this case was then in effect. Butler addressed the bankruptcy stay in his reply brief to this court, stating, "As the Defendant-Appellee, Cooper-Standard Automotive, Inc., filed for bankruptcy protection on August 3, 2009, and the mandatory stay has not yet been lifted, this reply brief is directed solely to Defendant-Appellee, Timothy Barnhisel . . . ."

The mandatory stay protects Cooper-Standard, but not Barnhisel, from "the commencement . . . of a judicial, administrative, or other action or proceeding against the debtor that was or could have been commenced before the commencement of the case under this title." 11 U.S.C. § 362. Butler's claims against Barnhisel remain active because the mandatory stay does not apply to "separate legal entities such as corporate affiliates, partners in debtor partnerships, or to codefendants in pending litigation." *Patton v. Bearden*, 8 F.3d 343, 349 (6th Cir. 1993) (citation omitted; emphasis removed). In unusual circumstances, some courts have extended the protection of the mandatory stay to codefendants in a suit, *see A.H. Robbins Co. v. Piccinin*, 788 F.2d 994 (4th Cir. 1986), but Barnhisel has not moved for protection under the stay or otherwise "brought forth any evidence of unusual circumstances which would justify extending the automatic stay to [his] protection." *Patton*, 8 F.3d at 349.

Butler cannot show that Barnhisel unlawfully discriminated against Butler on account of race because Butler has not created a question of fact as to whether any adverse employment actions were the product of discrimination by Barnhisel against Butler. "The Ohio Supreme Court has ruled that federal case law interpreting and applying Title VII is generally applicable to cases involving [R.C. Chapter] 4112." *Genaro v. Central Transp., Inc.*, 703 N.E.2d 782, 784 (Ohio 1999). However, because the definition of employer found in the Ohio code is broader than that of Title VII, "a supervisor/manager may be held jointly and/or severally liable with her/his employer for discriminatory conduct of the supervisor/manager in violation of R.C. Chapter 4112." *Id.* at 787-88. Therefore, "individual supervisors and managers are accountable for their own discriminatory

conduct occurring in the workplace environment." *Id.* at 787. Under this broader standard, however, Butler cannot show that Barnhisel is liable for his termination because Butler has not created a question of fact as to whether his termination was the product of Barnhisel's discriminatory conduct.

Of the two events supporting Butler's termination, Barnhisel was involved in only one. As the supervisor for the shift in which the altercations between Uzelac and Butler occurred, Barnhisel was involved in meetings to discuss the incident. When Uzelac and Butler clashed on their second day of working together, it was department manager Richard Meeks to whom Uzelac reported the incident. Although Barnhisel attended the meeting that followed, Meeks and a union representative were also present. Following this meeting, Uzelac and Butler both received "information only" employee corrective action notices. Several days later, Dewey Maynard, the plant manager, met with both employees individually in the presence of a representative from human resources and a representative from the union. Maynard's notes of his meeting with Butler indicate that Butler became agitated when Maynard told Butler that the plant could not have people refusing to do their best and preventing others from doing their best. When Butler informed Maynard that everyone was lying, Maynard told Butler that people from human resources had interviewed the witnesses Butler suggested be interviewed, and those witnesses all stated that Butler's behavior was not proper. It was only during this meeting that the plant manager informed Butler that any further incidents could result in termination.

Butler does not allege that Barnhisel was at all involved in the incident with Brose in which Butler was alleged to have prevented Brose from firing another load by pressing the E-stop button. Moreover, there is ample evidence in the record to support the claim that Butler was terminated for violation of company policy. Following Butler's termination the union conducted an independent inquiry and determined that the company had just cause to terminate Butler. Although Butler alleges that Cooper-Standard gave inconsistent explanations for his termination, Cooper-Standard has been consistent in maintaining that Butler was terminated for interfering with the productivity of fellow employees. This was the reason Cooper-Standard articulated in the termination notice, the motion for summary judgment, and on appeal. Accordingly, Butler has not created a question of fact as to whether his termination was the product of discriminatory conduct by Barnhisel.

Butler argues that because Barnhisel was Butler's supervisor for the shift in which the altercations with Uzelac occurred a reasonable jury could infer that discrimination by Barnhisel could have influenced the termination. Butler relies on *E.E.O.C. v. Chrysler LLC*, 610 F.Supp.2d 818, 830 (E.D. Mich. 2009), for the proposition that an allegedly discriminatory supervisor not involved in disciplining an employee could have influenced the discipline as the supervisor of the supervisors who instigated the discipline against the employees. Here, however, the decision to terminate Butler occurred above, not below, Barnhisel, and in a manner that makes it unlikely that discrimination by Barnhisel could have influenced the proceedings. Both the plant manager and the mandrel department manager were involved in the two meetings with Butler to discuss the altercation with Uzelac. Although Barnhisel was serving as shift supervisor at the time of the first

incident, the incident was first reported to the department manager, who was standing in close proximity to the employees when the event occurred, Butler and Uzelac both received a minor information-only discipline after this meeting, and the only evidence Barnhisel was involved at all in the incident was his signature, along with the department manager and representatives from human resources and the union, on the information-only disciplinary notice. It was only after meeting with the plant manager that Butler was told he could be terminated for future misconduct. When that future misconduct allegedly occurred during Butler's dispute with Brose, Barnhisel was not at all involved.

Butler also claims that Barnhisel's alleged practice of assigning Butler the out of the ordinary job duties that came to be known as Jimmie Jobs was designed to lead to Butler's termination. In support of this argument, Butler points to the deposition testimony of Michael St. Clair to show that Jimmie Jobs were designed to get Butler fired. During St. Clair's deposition, the following exchange took place:

> Q: Do you remember the expression Jimmie projects, or Jimmie work?
> A: Jimmie projects or Jimmie work from other people, yeah.
> Q: You heard other people complain about it?
> A: I don't know exactly where you're going with that.
> Q: Huh?
> A: I don't know where that came from really. I thought that this was to get Jimmie out.
> Q: Did the Jimmie projects have – what – did people complaint to you about don't mention this when they mentioned Jimmie projects?
> A: Jimmie project, like get him fired. That's what I was talking about.
> Q: Was Jimmie the only person you heard talk about it? Or other people you heard talk about it?
> A: I heard some people say some stuff but I don't know exactly what they was referring to either though.

> Q:   Okay. Had you ever observed that when Jimmie was working with you, that you had to work harder than when Jimmie wasn't working with you?
>
> A:   No, only got to work as hard as, you know, got your stuff you've got to do. You do your stuff. And if somebody does that or something that Jimmie might not have been doing, that was their choice.

It is unclear exactly what St. Clair was referring to when he stated "Jimmie project, like get him fired." St. Clair does not state clearly that he believes the purpose of Jimmie Jobs was to get Butler fired. However, St. Clair clearly stated that he was not required to do extra work when paired in a pool with Butler. This is consistent with Butler's own testimony, which was that Barnhisel did not assign him jobs outside the duties of a mandrel operator, that white employees would always be assigned the same tasks as Butler, and that Butler was required to work only until the end of the shift. Moreover, other employees testified that they would have to perform Jimmie Jobs even when they were not assigned to pools with Butler. Under these circumstances, Butler has failed to establish that Barnhisel unlawfully discriminated against Butler in assigning work in an effort to get him fired. Butler's evidence of Barnhisel's interactions with other African-American employees at the plant does give reason for pause, especially Barnhisel's alleged statement to Brownlee that he should "come back to the mandrel department so we can do you like we did Roy," but this does not raise a question of fact as to whether discrimination by Barnhisel played a role in Butler's termination.

Barnhisel was also entitled to summary judgment with respect to Butler's retaliation claims because Butler cannot show that Barnhisel took any adverse action against Butler based on Butler's complaints of racial harassment. In addition to claiming that his termination was the result of Barnhisel's retaliation or discrimination, Butler argues that Barnhisel issued at least five notices to

Butler: (1) a June 10, 2006 attendance sheet given to Butler by Barnhisel discussing Butler's failure to wear proper hearing and eye protection ; (2) an attendance notification that Butler had reached four attendance points signed by Barnhisel in 2001; (3) another attendance notification signed by Barnhisel informing Butler in 2002 that he had reached four attendance points; (4) an attendance sheet signed by Barnhisel involving the incident between Butler and Uzelac; and (5) the information-only employee corrective action notice given to both Uzelac and Butler, signed by Barnhisel. Because the first three of these events occurred prior to Butler's initial complaint of discrimination, and because Butler has not shown that retaliation by Barnhisel resulted in the discipline for the incidents involving Uzelac, Barnhisel is entitled to summary judgment with respect to Butler's retaliation claims.

To maintain a claim for retaliation, an employee must establish that (1) the employee engaged in Title VII-protected activity; (2) the defendant knew that the employee engaged in protected activity; (3) the defendant subsequently took an adverse employment action against the employee; (4) the adverse action was causally related to the protected activity. *Ladd v. Grand Trunk W. R.R.*, 552 F.3d 495, 502 (6th Cir. 2009). Here, Barnhisel's discipline of Butler for failing to wear earplugs and the first two attendance notifications all occurred in June of 2006, and Butler did not file his initial complaint with the EEOC until August of 2006. The first two attendance notifications were issued in 2001 and 2002, long before Butler's initial complaint. Because these employment actions were taken prior to Butler's initial complaints of race discrimination, they cannot serve as the basis for a retaliation claim, regardless of whether these events actually constituted "adverse employment

actions." *See Lindsey v. Whirlpool*, 295 F.App'x 758, 769 (6th Cir. 2008). Although the last two notices identified by Butler involving Butler's altercation with Uzelac and Butler's eventual termination did take place after Butler's EEOC complaints, they cannot serve as the basis for a retaliation claim against Barnhisel because, as discussed in relation to Butler's race discrimination claims, Barnhisel's alleged involvement in these incidents was not sufficient to create a fact question as to whether these notices were the product of discrimination by Barnhisel.

Barnhisel was also entitled to summary judgment with respect to Butler's hostile work environment claim because Butler has not developed any arguments as to why the district court erred in granting summary judgment on this claim. Butler's brief mentions the phrase "hostile work environment" only three times and cites no cases supporting his hostile work environment claim. In the fact section, Butler describes the practice of assigning him "Jimmie Jobs" and states that other employees did not want to work with Butler because they would also be required to perform "Jimmie Jobs." Butler then asserts that "[t]his created a hostile work environment where operators like Uzelac who never worked with Plaintiff nonetheless resented him." In the argument section, Butler states, "It is impossible to neatly categorize the actions of Barnhisel, Espen, Rosendale and other Cooper employees under acts of discrimination, creation of a hostile work environment, retaliation, or just evidence of discriminatory intent. As a whole the singular intent was, as articulated by St. Clair was, 'get him fired.'" Finally, Butler states, "Defendants' behavior served multiple purposes, retribution for Plaintiff's protected activities, . . . creation of a hostile work environment calculated to drive Plaintiff from his job and failing that, the course of action served Cooper's purpose of

inflating the, 'things that Jimmie had done wrong,' which was presented as a basis for his termination." Nowhere in these three sentences, or elsewhere, does Butler address any reason the district court erred in granting summary judgment for Cooper-Standard and Barnhisel. "[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived." *Dillery v. City of Sandusky*, 398 F.3d 562, 569 (6th Cir. 2005).

The situation presented by Butler's brief is similar to that presented in *Hunter v. Secretary of United States Army*, 565 F.3d 986, 995 (6th Cir. 2009). The court in that case devoted only four sentences to the appellant's hostile work environment claim, stating:

> Although Hunter's brief identifies the dismissal of his hostile-work-environment claim as an issue, his brief does not specifically discuss why the district court allegedly erred in granting summary judgment in favor of the government on this claim. Nor does Hunter cite any relevant authority on point. The government's brief, accordingly, does not address the hostile-work-environment issue at all. We therefore consider this issue waived.

*Id.* at 995. In his statement of the issues, Butler does not address the hostile work environment claim specifically. Although Cooper-Standard and Barnhisel address the hostile work environment issue in the present case, they do so merely by asserting that the district court's resolution of the issue was correct and by summarizing the basis of that opinion. Butler's failure to address any error in the district court's resolution of the issue is even more noteworthy for this appeal because the district court's opinion addresses a single instance of racial harassment in which Butler does not allege Barnhisel was at all involved, when Brock Tong called Butler a "lazy ni****." Butler has not challenged the basis of the district court's opinion regarding his hostile work environment claim and the issue is therefore waived.

For the foregoing reasons, we affirm the judgment of the district court granting summary

judgment to Timothy Barnhisel.