NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 12a0976n.06

No. 09-3349

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**

***Sep 04, 2012***
DEBORAH S. HUNT, Clerk

JIMMIE BUTLER,

    Plaintiff-Appellant,

        v.

COOPER-STANDARD AUTOMOTIVE, INC.,

    Defendant-Appellee.

)
)
)
)
)
)
)
)
)
)
)
)

ON APPEAL FROM THE
UNITED STATES DISTRICT
COURT FOR THE
NORTHERN DISTRICT OF
OHIO

BEFORE:  SILER, ROGERS, and McKEAGUE, Circuit Judges.

**ROGERS, Circuit Judge.** Jimmie Butler appeals the district court's grant of summary judgment for Cooper-Standard Automotive on Butler's claims of race discrimination, hostile work environment, and retaliation in violation of federal and Ohio law.  The district court granted summary judgment for Cooper-Standard after determining that Butler could not show that Cooper-Standard's legitimate reasons for his termination were merely a pretext for racial discrimination or retaliation and that Butler had not alleged discrimination pervasive enough to create a hostile work environment.  During Butler's initial appeal, Cooper-Standard filed for bankruptcy protection, resulting in an automatic stay.  On June 28, 2011, the stay with regard to Cooper-Standard was lifted. Because Butler has not established that his termination was merely a pretext for discrimination or retaliation, and he has not provided sufficient evidence of pervasive discrimination to support his hostile work environment claim, the district court properly granted Cooper-Standard's summary judgment motion.

Jimmie Butler was employed as a mandrel operator at Cooper-Standard's Bowling Green, Ohio, plant from June 1996 until September 2007, when he was terminated by the company. Mandrels are racks of metal forms used by Cooper-Standard to shape rubber hoses for use in auto parts. As a mandrel operator, Butler's main job duties were to set up supplies used during a shift, load and unload racked metal forms, transport materials to and from the autoclave (a large curing oven), and to change over racks of mandrels and metal bars. R.38.2 at 2-3. Mandrel operators were required to perform various "indirect labor" activities, such as stocking materials, obtaining baskets to hold parts, washing baskets and the parts, and clearing the area where they unload the cured parts. At Cooper-Standard, mandrel operators are assigned to work in small groups called pools, usually consisting of two but sometimes three operators. R.47.2 at 57. The general practice among mandrel operators is that the operator with the most seniority of the two or three pool members determines the pace of the work. During a single shift, employees are contractually required to complete a minimum of eighteen loads.

Butler claims that Cooper-Standard has a "history of mistreating black employees." R.65 at 19. As evidence, Butler provides examples of other African American employees who had previously worked at Cooper-Standard. Michael Brownlee, who worked in the finishing department, testified that in 2006, Barnhisel, Butler's supervisor against whom he also brought claims of race discrimination, approached Brownlee and Sean Walker, another African American employee, to confront Walker about violating the safety glasses rule. R.47.4 at 18. After Barnhisel stated that Brownlee looked like he had something to say, Brownlee asked why Barnhisel was even talking to him. R.47.4 at 18. When Brownlee threatened to discuss any issues with management, Barnhisel

said, "For what? So you can go up there and play the race card again?" R.47.4 at 31. Brownlee also alleged that at some point during the discussion, Barnhisel told Brownlee that he should "come back to the mandrel department so we can do you like we did Roy." R.47.4 at 21. Roy Williams was an African American employee at Cooper-Standard who Butler believes was fired as a result of discrimination.

Butler also alleges that he was a victim of race discrimination by Barnhisel. Butler states that Barnhisel's practice of assigning Butler to the most undesirable jobs and extra work became so commonplace that those jobs were known as "Jimmie Jobs." Butler alleges that other employees did not want to work with him because they did not want to be assigned extra work. Brock Tong, another employee, testified that he coined the phrase to refer to work around the plant that Butler refused to perform. R.47.11 at 30.

Butler filed a charge of discrimination with the EEOC regarding Barnhisel in August 2006, stating that "[t]he supervisor harass[es] me ever[y] chance he gets." R.47.24 at 2  Butler filed a second charge of discrimination with the EEOC after he was called a ni**** by Tong. After the incident, Tong was suspended for the day and was required to watch a harassment video. R.47.11 at 15-18.

In August 2007, Butler and another employee named Uzelac were involved in the first of two incidents that Cooper-Standard relied upon to support Butler's termination. After Butler and Uzelac were assigned to work in the same pool, the pair had a dispute about how many loads they were going to fire. R.37.5 at 15. According to Uzelac, the pair was one short of the required minimum eighteen loads, but Butler only wanted to do seventeen loads that day because of a company meeting.

R.47.13 at 11.  The following day, Uzelac and Butler again worked in the same pool and were involved in another dispute over how many loads to fire.  *Id.* at 12.  Uzelac, who was senior to Butler, wanted to fire more than eighteen loads but Uzelac claimed that Butler only wanted to do the minimum.  *Id.* at 13.  As a result, the pair argued.  Uzelac claimed that Butler caused Uzelac to be burned by pushing hot mandrel bars into Uzelac's side of the pool, and Uzelac threatened to "jack slap" Butler if it happened again.  *Id.* at 15.  A meeting was held among Butler, Uzelac, Department Manager Richard Meeks, Barnhisel (the supervisor at the time), and a union representative.  R.38.7 at 1-3.  Following this meeting, both Butler and Uzelac were given an "information only" employee Corrective Action Notice in which they were told that they needed to work well with other employees and fire as many loads as possible.  *Id.* at 2.

In September 2007, Butler was terminated after an incident that occurred while Butler was working in a pool with St. Clair and John Brose, who are both Caucasian.  According to St. Clair, he and Butler requested that Brose slow down so that they could "stock up."  R.47.12 at 17.  St. Clair then testified that Brose ignored him, attempted to fire another load, and then went to get a supervisor after "Jimmie like got in his way or something."  R.47.12 at 21.  Brose testified at his deposition that he originally agreed to slow down, but then proceeded to fire a load anyway until Jimmie pressed the E-stop button, which prevented the load from firing.  R.47.3 at 22.  Following an investigation, Cooper-Standard terminated Butler for interfering with the productivity of another worker.  R.38.13 at 2.  The union conducted its own investigation and concluded that Cooper-Standard had just cause to terminate Butler under the collective bargaining agreement.  R.38.14 at 2.

Butler filed his third and final charge with the EEOC, claiming that he was terminated for calling a co-worker a crybaby and stating that an employee who had previously called him a ni**** had received no discipline. Butler's complaint stated that Butler felt he had been terminated in violation of the Civil Rights Act of 1964. R.47.26 at 2. Butler then filed this lawsuit against both Barnhisel and Cooper-Standard, alleging race discrimination, retaliation, and hostile work environment under state and federal law. R.1.1.

Cooper-Standard and Barnhisel moved for summary judgment on all claims and the district court granted the motion in February 2009. R.65 at 1. The district court determined that Butler had not shown race discrimination through direct evidence and that Butler could not show that Cooper-Standard's stated reason for terminating Butler was merely pretext for discrimination. *Id.* at 16-22. The court also held that Butler had not produced sufficient evidence to allow a reasonable jury to conclude that race was a factor in Butler's termination. *Id.* at 23. The district court granted summary judgment for Cooper-Standard and Barnhisel on Butler's hostile work environment claim after determining that because Butler had alleged that he was subject to only one racial slur during his time at the plant he had not alleged sufficient racial harassment to support his claim. *Id.* at 25. Regarding Butler's retaliation claim, the district court identified seven adverse employment actions that might support his claim and found that Butler had established a prima facie case of retaliation. *Id.* at 27. However, the court held that Butler could not show that any of Cooper-Standard's stated reasons for the adverse employment actions was merely pretext. R.65 at 29. Butler filed this timely appeal.

While this appeal was pending, Cooper-Standard filed for Chapter 11 bankruptcy protection. Cooper-Standard then filed notice with this court that an automatic stay protecting Cooper-Standard was in effect. The case moved forward against Barnhisel, and we affirmed the district court's grant of summary judgment in favor of Barnhisel. On June 28, 2011, the automatic stay was lifted, and Butler now pursues the appeal with respect to his race discrimination, hostile work environment, and retaliation claims against Cooper-Standard.

Cooper-Standard is entitled to summary judgment with respect to Butler's race discrimination claim. Assuming, as the district court did, R.65 at 18, that Butler has established a prima facie case of race discrimination, Butler's claim still fails because Butler has not sufficiently shown that it was his race, and not his actions interfering with a co-worker's productivity, that led to his termination. Cooper-Standard has proffered a legitimate, non-discriminatory reason for Butler's termination. Accordingly, the burden shifted back to Butler to show that this proffered reason was only a pretext. *See, e.g.*, *Spengler v. Worthington Cylinders*, 615 F.3d 481, 492 (6th Cir. 2010); *Risch v. Royal Oak Police Dept.*, 581 F.3d 383, 391 (6th Cir. 2009).

Butler makes four arguments, none of which raises a genuine issue of material fact that shows that Cooper-Standard's explanation was pretextual. First, Butler argues that Cooper-Standard's inconsistent reasons for his termination prove that the company's proffered reason did not actually motivate Cooper-Standard's challenged conduct. However, in the case against Barnhisel, we previously determined that, "[a]lthough Butler alleges that Cooper-Standard gave inconsistent explanations for his termination, Cooper-Standard has been consistent in maintaining that Butler was terminated for interfering with the productivity of fellow employees. This was the reason Cooper-

6

Standard articulated in the termination notice, the motion for summary judgment, and on appeal." *Butler*, 376 F. App'x at 493. Butler's arguments do not sufficiently challenge this determination as to warrant a different conclusion here. For instance, the written explanation given at the meeting where Butler was formally terminated stated, "J. Butler admitted physically preventing John Brose from firing another load." R.47-16 at 45, and a letter from the plant manager to Butler's union also stated that Butler's "behavior impact[ed] on productivity [and] was physical in nature." R. 47-17 at 40. Cooper-Standard's proffered reason for his termination has been consistent, and Butler's arguments to the contrary do not show that the company had a discriminatory motive.

Second, Butler claims that he was not given sufficient notice after the incident with Uzelac, and that his alleged conduct was "insufficient to warrant termination. This argument is not supported by the facts. Plant Manager Maynard's notes, taken contemporaneously during his meeting with Butler after the incident with Uzelac, state that "I told Jimm[ie] that any further incidents would result in his being suspended or terminated at this point." R.38-8 at 7. In addition, though Butler argues that the Corrective Action Notice issued to both Uzelac and Butler was "information only," and thus did not sufficiently warn Butler about the possibility of termination, the notice made clear that Butler was expected to improve his performance and get along with co-workers. R.38-7 at 2.

Third, Butler argues both that it was not a violation of company policy to press the E-stop button and that he never physically prevented another employee from firing another load, essentially arguing that the company's proffered reason is pretextual because it has no basis in fact. These arguments lack merit. Butler cannot prove that hitting the E-stop button is not a violation; in fact,

the cites that he provides, of Brose's deposition, *id.* at 21, and St. Clair's deposition, R.47-12 at 17, 28-29, do not even discuss the E-stop button. However, even if Butler's assertions were correct, what matters is whether Cooper-Standard had a good faith belief that Butler had interfered with a co-worker's productivity. To prove pretext, Butler must "put forth evidence which demonstrates that the employer did not 'honestly believe' in the proffered non-discriminatory reason for its adverse employment action." *Braithwaite v. Tinken Co.*, 258 F.3d 488, 494 (6th Cir. 2001). Here Butler's union, after conducting its own investigation, determined that Butler had been "warned that any further incidents involving his preventing or interfering with other employees performing their jobs could result in his termination . . . . [and] the Grievance Committee concluded that the Company could demonstrate that Butler interfered with John Brose's performance of his job." R.38-14, para. 5-8. Therefore, though the parties may dispute the underlying facts, Butler has not sufficiently undermined Cooper-Standard's good faith assertion that it fired Butler for interfering with the plant's productivity.

Finally, Butler suggests that Cooper-Standard impermissibly relied on a "distorted reality" of Butler's employment history, rather than the two instances of employee interference that Cooper-Standard alleges led to Butler's termination. Appellant Reply Br. (Supplemental Briefing) at 9. However, even if Cooper-Standard did review Butler's "entire employment history," *id.* at 22, this does not mean that the two instances were not the motivating factors. In fact, the written explanation states that the impetus for reviewing Butler's employment history is "this incident [the Brose incident] & the closeness in time to the incident with Troy Uzelac." *Id*. Butler's argument is unpersuasive.

8

As with Butler's race discrimination claim, because Butler cannot rebut Cooper-Standard's legitimate proffered reason for his termination, Cooper-Standard was entitled to summary judgment with respect to Butler's retaliation claim. Butler offers no new arguments for his retaliation claim, asserting that his pretext arguments for his race discrimination claim "appl[y] with equal respect to [his] retaliation claims." Appellant Reply Br. (Supplemental Briefing) at 27. Therefore, for the reasons already discussed, the district court properly granted summary judgment to Cooper-Standard for Butler's retaliation claim.

Finally, Butler's hostile work environment claim lacks merit. Because Butler's initial brief does not address why the district court erred in granting Cooper-Standard's summary judgment motion on Butler's hostile work environment claim, Butler waived this claim. *Dillery v. City of Sandusky*, 398 F.3d 562, 569 (6th Cir. 2005). Even if this were not the case, however, the examples Butler provides did not sink to the level we described in *In re Rodriguez*, 487 F.3d 1001, 1010 (6th Cir. 2007) (quoting *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21 (1993)): a "'workplace . . . permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" The racial slur made by Tong in his supplemental reply brief is the only evidence of racial harassment that Butler provides that happened directly to him. In that event, Cooper-Standard reacted promptly, suspending Tong for the rest of the day and providing him with harassment training. Cooper-Standard exercised reasonable care to correct promptly the racial harassment, and this militates against Butler's hostile work environment claim against Cooper-Standard. *See Jackson v. Quanex Corp.*, 191 F.3d 647, 663 (6th Cir. 1999), Butler's other

examples—the "race card" comment his supervisor, Barnhisel, allegedly made, as well as the suggestion that Williams, another African American employee, was fired as a "lesson" to others—while offensive, do not "create an objectively hostile or abusive work environment—an environment that a reasonable person would find hostile or abusive." Butler's hostile work environment claim, therefore, fails.

Butler's claims regarding "Jimmie Jobs" is similarly unpersuasive. First, it is unclear from the record what exactly "Jimmie Jobs" are; while Butler argues that it refers to the extra work he received, Tong claims that coined the phrase to connote work that Butler refused to perform. R.47.11 at 30. Even if Butler's interpretation is correct, however, he has not sufficiently shown that this harassment was based on his race. *See Williams v. CSX Transp. Co., Inc.*, 643 F.3d 502, 511 (6th Cir. 2011). To prove that harassment was based on his race, Butler could either present "direct evidence of the use of race-specific and derogatory terms" or "comparative evidence about how the alleged harasser treated members of both races in a mixed-race workplace." *Id.* The term "Jimmie Jobs" is not "race-specific," as others were also required to complete extra work assigned to them regardless of race. Butler, therefore, has not provided sufficient evidence to support a hostile work environment claim.

For the foregoing reasons, the district court's grant of Cooper-Standard's summary judgment motion is affirmed.