**Andrea Mosby MEACHEM, Plaintiff,**

**v.**

**MEMPHIS LIGHT, GAS & WATER DIVISION, Defendant.**

Case No. 2:14–cv–02156–JTF–dkv.

United States District Court,
W.D. Tennessee,
Western Division.

Signed Aug. 10, 2015.

William B. Ryan, Janelle Crandall Osowski, Donati Law Firm, LLP, Memphis, TN, for Plaintiff.

Michael D. Tauer, Miska Lerose Shaw, Saul C. Belz, Glankler Brown, PLLC, Memphis, TN, for Defendant.

## ORDER DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

JOHN T. FOWLKES, JR., District Judge.

Before the Court comes Defendant Memphis Light, Gas & Water's Motion for Summary Judgment filed March 31, 2015. (ECF No. 44). On May 4, 2015, Plaintiff Andrea Mosby Meachem filed her Response in Opposition, (ECF No. 53), to which Defendant filed a Reply on May 29, 2015, (ECF No. 56).[1] After review of the Motion, Response, Reply, and the entire record, the Court DENIES Defendant's Motion for Summary Judgment.

### I. *FACTUAL HISTORY*

In 2005, Plaintiff was hired by Defendant for an Attorney 3 position [2] within the Department of Legal Services ("Department"). (ECF No. 44–1 at p. 5). During

---

1. On June 9, 2015, Plaintiff filed a Notice regarding some evidentiary objections made by Defendant within their Reply. (ECF No. 59).

2. The Job Description for the Attorney 3 position lists "essential functions" as follows:

1. Perform senior level legal assistance to prosecute and defend, in accordance with the Vice President & General Counsel, all suits by or against the Division; and provide analysis and counsel on legal, policy, compliance issues, and actual or anticipated lawsuits.

her tenure, Plaintiff was supervised by Defendant's Vice President and General Counsel, Ms. Cheryl Patterson ("Patterson"). *Id.* The Department consists of Patterson, as well as, four other attorneys. *Id.* As an Attorney 3, Plaintiff primarily manages workers' compensation claims, employment issues, and litigation, but Plaintiff has never participated in a trial during her then 8–year tenure. (ECF No. 53 at p. 2).

On January 2, 2013, during the 23rd week of Plaintiff's pregnancy, Plaintiff's doctors discovered that Plaintiff's cervix had shortened, hospitalizing Plaintiff. (ECF Nos. 44–1 at p. 8; 53 at p. 3). As such, Plaintiff underwent corrective surgery on January 3, 2013. Plaintiff called her supervisor, Patterson, and informed her of Plaintiff's medical complications, which would require bed rest for up to eleven weeks. (ECF No. 44–1 at pp. 8–10). At first, Patterson seemed agreeable to allowing Plaintiff to continue working

once Defendant was provided appropriate supporting documentation. (ECF Nos. 53 at p. 3; 53–1 at ¶ 109) (stating that Plaintiff continued working until her accommodation request was denied); *see also* (ECF No. 44–23) (January 30, 2013, denial letter).

On January 7, 2013, Plaintiff made an official accommodation request to work from bed, either within the hospital or within her home. (ECF No. 44–1 at p. 11). That same day, the ADA Committee ("Committee")—consisting of Eric Conway, Steve Day, and Rutha Griffin [3]—met to discuss Plaintiff's requested accommodation. *Id.* On January 9, 2013, Dr. Shannon Malone wrote a letter advising the Defendant that Plaintiff was on bed rest, and in particular, noted that "[i]t would be ok for [Plaintiff] to work from her hospital or home." *Id.* at p. 10; (ECF No. 53 at p. 3). On January 15, 2013, the Committee, along with Patterson and Vernica Davis,[4] held an interactive [5] process with Plaintiff,

2. Review and evaluate investigations; based on laws or facts, determine the method of investigation, its extent, legal sufficiency of evidence, applicable laws and the basis and method of settlement. If settlement is not indicated, determine method of defense at law or equity in the court.
3. Perform legal research on pending cases and current problems.
4. Render legal services and opinions of rights, obligations and privileges for Division employees as requested.
5. Draft, negotiate and prepare contracts and other legal documents; review and approve proposed contracts and legal documents.
6. Negotiate, in accordance with the Vice President & General Counsel, insurance representatives, lawyers, etc. regarding settlements.
7. Interview and take depositions of witnesses; arrange for and conduct pre-trial conferences; and keep Division up to date on new/revised laws, compliance standards and regulations.

8. Represent the Division and try cases in court; and may act as agent of the Division in various transactions.
9. Supervise, direct and train assigned employees such as: paralegals, medical services, support staff, and/or legal students.
10. Perform other duties as directed.
*See generally* (ECF No. 44–11) (providing the full description of the position).

3. Mr. Conway is the Human Resources Compliance Coordinator, Mr. Day is the Manager of Labor and Employee Relations, and Ms. Griffin is the Manager of Employment Services. (ECF No. 44–1 at p. 11).

4. Ms. Davis is the Medical Services Coordinator and nurse for Defendant. *Id.* at 12.

5. There is evidence in the record that such process was not in fact interactive. *See* (ECF No. 53 at p. 3) ("Mr. Conway told [Plaintiff] that [Defendant's] President, Jerry Collins, directed ... Patterson to deny [Plaintiff's] request" prior to the interactive process meeting.); *see also* (ECF Nos. 44–13 at p. 10; 53–1 at ¶ 111; 53–19) (noting "No Telecommuting Per Jerry" dated January 3, 2013); (ECF No.

in which Plaintiff was asked whether she could perform each essential job function. (ECF No. 44–1 at p. 12). Plaintiff responded in the affirmative for each question asked; reiterating that all work could be done telephonically or through use of a computer. *Id.*; (ECF No. 53 at p. 4) (requiring only "remote access to her computer and access to her electronic case files"). Patterson relayed her concerns that Plaintiff would not be able to perform certain tasks without her being physically present. (ECF No. 44–1 at p. 12). The committee denied Plaintiff's accommodation request on January 18, 2013. (ECF No. 53 at p. 5). However, Plaintiff did not receive notice until January 30, 2013. *Id.*; *see also* (ECF No. 44–23). The crux of the Committee's denial letter of January 30, 2013, stated that (1) physical presence was required and (2) Plaintiff's request elevated concerns of confidentiality. (ECF No. 44–1 at p. 13).

Defendant provided Plaintiff with job-protected sick leave until exhausted and short-term disability benefits thereafter. *Id.* Plaintiff appealed Defendant's denial on February 2, 2013, via email. (ECF No. 53 at p. 5). On February 9, 2013, Dr. Paul Neblett provided an "Attending Physician Statement" advising Plaintiff not to work, which assisted Plaintiff's application for short term disability insurance. (ECF No. 44–1 at p. 8). Also, on February 18, 2013, Dr. Neblett authorized a "Certification of Health Care Provider for Employee's Serious Health Condition," noting Plaintiff's inability to drive to work and sit at a desk all day, which allowed for Plaintiff to receive sick leave under FMLA. *Id.* Defendant again notified Plaintiff of their denial on February 19, 2013, to which Plaintiff again appealed on February 21, 2013. (ECF No. 53 at p. 5).

In total, Plaintiff utilized nearly four weeks of sick leave with the remainder covered by the short-term disability benefits. (ECF No. 44–1 at p. 12). Plaintiff stated that she had symptoms beginning January 2, 2013, such as being "unable to concentrate, analyze information and make legal decisions." *Id.* at p. 14. Dr. John Cooper could not determine whether such symptoms were caused or exacerbated by Plaintiff's "high risk" pregnancy, domestic issues, or Defendant's failure to provide Plaintiff's accommodation. *Id.*

With Plaintiff able to return the work on April 1, 2013, the accommodation period pertinent to this matter lasted from January 3, 2013, through March 31, 2013. *Id.* at pp. 3, 10. From February 26, 2013, until the end of the accommodation period, Plaintiff's license to practice law was suspended for failure to pay the annual registration fee. *Id.* at p. 14. Such failure to pay was a clerical error on the part of the Defendant. *See* (ECF No. 53 at p. 10, 26–27) (stating that Defendant had a temporary billing clerk at the time of the error). The suspension was publicized under Plaintiff's name via the Tennessee Bar Association Board of Governors email distribution list and website. (ECF No. 44–1 at p. 15). Plaintiff's return to work in April 2013 was fully compensated despite Defendant's awareness of Plaintiff's suspension. *Id.* Plaintiff, however, claims that she lacked awareness until receiving a June 28, 2013 letter from Patterson. (ECF Nos. 53 at p. 10, 26–27; 53–1 at ¶ 78) (claiming that Plaintiff's suspension was never discussed prior).

Patterson, as Plaintiff's supervisor, completed a written appraisal for Plaintiff's performance for 2013. (ECF No. 44–1 at p. 15). Plaintiff was assigned an overall

---

53 at p. 3) (stating that "at no time, did [Defendant] question Dr. Malone's opinion and/or statement regarding [Plaintiff's] ability to work from home. Nor did [Defendant] ever seek clarification, or claim that this note was insufficient." (internal citations omitted)).

score of "3", which included a 40% rating for negative media towards Defendant. *Id.* at pp. 15–16; (ECF No. 53 at .p. 11). Such rating also included some commentary that Plaintiff finds retaliatory. (ECF No. 53 at p. 11) (stating that many of the comments were "without any factual basis"). Specifically, Plaintiff does not find the overall score retaliatory, but the commentary, which is readily viewable under Tennessee's open records act. (ECF No. 53–1 at ¶ 137). Additionally, Patterson has assigned medical-related employee accommodation requests to other attorneys. (ECF No. 44–1 at p. 17).

## II. *LEGAL STANDARD*

Under Fed.R.Civ.P. 56, the court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). The party moving for summary judgment must prove clearly and convincingly that there is no genuine issue of material fact, while the Court must draw all reasonable inferences and read in the light most favorable to the non-moving party. *Kochins v. Linden–Alimak, Inc.,* 799 F.2d 1128, 1133 (6th Cir.1986) (citing *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970)); *see* Fed.R.Civ.P. 56(a). The moving party can meet this burden by pointing out to the court that the respondent, having had sufficient opportunity for discovery, has no evidence to support an essential element of his case. *See* Fed.R.Civ.P. 56(c)(2); *see also Street v. J.C. Bradford & Co.,* 886 F.2d 1472, 1479 (6th Cir.1989) ("The respondent cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but must present affirmative evidence in order to defeat a properly supported motion for summary judgment." (internal quotation marks omitted)).

When confronted with a properly supported motion for summary judgment, the respondent must set forth specific facts showing that there is a genuine dispute for trial. *See* Fed.R.Civ.P. 56(c). A genuine dispute for trial exists if the evidence is such that a *reasonable* jury could return a verdict for the nonmoving party. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (emphasis added) (requiring more than the "mere existence of a scintilla of evidence"). The nonmoving party must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (citing *DeLuca v. Atl. Refining Co.,* 176 F.2d 421, 423 (2d Cir.1949)). Furthermore, one may not oppose a properly supported summary judgment motion by mere reliance on the pleadings. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Instead, the nonmovant must present "concrete evidence supporting [his] claims." *Cloverdale Equip. Co. v. Simon Aerials, Inc.,* 869 F.2d 934, 937 (6th Cir.1989) (citations omitted); *see* Fed.R.Civ.P. 56(c)(1). The district court does not have the duty to search the record for such evidence. *See* Fed.R.Civ.P. 56(c)(3); *InterRoyal Corp. v. Sponseller,* 889 F.2d 108, 111 (6th Cir.1989). The nonmovant has the duty to point out specific evidence in the record that would be sufficient to justify a jury decision in his favor. *See* Fed.R.Civ.P. 56(c)(1); *InterRoyal Corp.,* 889 F.2d at 111. " 'Credibility determinations, the weighing of the evidence, and the drawing of legitimate inference from the facts are jury functions, not those of a judge.' " *Reeves v. Sanderson Plumbing Prods.,* 530 U.S. 133, 150, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000) (quoting *Anderson,* 477 U.S. at 255, 106 S.Ct. 2505).

814

## III. ANALYSIS

### A. Failure to Accommodate under the ADA

■ For Plaintiff to establish her *prima facie* case for failure to accommodate, Plaintiff "must show that: (1) [s]he is disabled within the meaning of the Act; (2) [s]he is otherwise qualified for the position, with or without reasonable accommodation; (3) h[er] employer knew or had reason to know about h[er] disability; (4) [s]he requested an accommodation; and (5) the employer failed to provide the necessary accommodation." *Melange v. City of Center Line*, 482 Fed.Appx. 81, 84 (6th Cir.2012) (citing *Johnson v. Cleveland City Sch. Dist.*, 443 Fed.Appx. 974, 982–83 (6th Cir.2011)). In the instant case, elements (1), (3), and (4) are uncontested. *See* (ECF No. 44–1 at p. 20).

■ "When a plaintiff seeks to establish his case indirectly, . . . the *McDonnell Douglas* burden-shifting approach applies. . . ." *Hedrick v. W. Reserve Care Sys. & Forum Health*, 355 F.3d 444, 453 (6th Cir.2004) (citing *Monette v. Elec. Data Sys. Corp.*, 90 F.3d 1173, 1186–87 (6th Cir.1996); *Walsh v. UPS*, 201 F.3d 718, 724–25 (6th Cir.2000)). However, "[w]hen an ADA plaintiff premises his claim upon direct evidence, we jettison the . . . McDonnell Douglas burden-shifting framework. . . ." *Kleiber v. Honda of Am. Mfg., Inc.*, 485 F.3d 862, 868–69 (6th Cir.2007) ("[C]laims premised upon an employer's failure to offer a reasonable accommodation necessarily involve direct evidence."). For direct evidence cases,

(1) The plaintiff bears the burden of establishing that he or she is disabled. (2) The plaintiff bears the burden of establishing that he or she is 'otherwise qualified' for the position despite his or her disability: (a) without accommodation from the employer; (b) with an alleged 'essential' job requirement eliminated; or (c) with a proposed reasonable accommodation. (3) The employer will bear the burden of proving that a challenged job criterion is essential, and therefore a business necessity, or that a proposed accommodation will impose an undue hardship upon the employer.

*Id.* at 869 (citing *Hedrick*, 355 F.3d at 452).

■ "The term 'qualified individual' means an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds. . . ." 42 U.S.C. § 12111(8) ("[C]onsideration shall be given to the employer's judgment as to what functions of a job are essential, and if an employer has prepared a written description . . ., this description shall be considered evidence of the essential functions of the job."). "[T]he employee bears the burden of showing she can perform the 'essential functions' of the job, with or without accommodation." *Johnson*, 443 Fed.Appx. at 983. Additionally, "the ADA does not require employers to accommodate individuals by shifting an essential job function onto others." *Hoskins v. Oakland Cnty. Sheriff's Dep't*, 227 F.3d 719, 729 (6th Cir.2000).

■ "The employee also bears the burden of proposing [a] reasonable accommodation[ ]." *Johnson*, 443 Fed.Appx. at 983. "Once the employee requests an accommodation, the employer has a duty to engage in an 'interactive process' to 'identify the precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations.'" *Melange*, 482 Fed.Appx. at 84–85 (citing *Kleiber*, 485 F.3d at 871). Such "'interactive process requires communication and good-faith exploration of possible accommodations.'" *Kleiber*, 485 F.3d at 871 (citing *Barnett v. U.S. Air, Inc.*, 228 F.3d 1105, 1114 (9th Cir.2000)).

Once the prima facie case is established, "the burden shifts to the employer to dem-

onstrate that any particular accommodation would impose an undue hardship on the employer." *Johnson,* 443 Fed.Appx. at 983.

### i. Whether Plaintiff is otherwise qualified

■ Defendant contends that Plaintiff was not "otherwise qualified" for three independent reasons: (1) bed rest restriction inhibited Plaintiff's ability to be physically present; (2) Plaintiff's mental disabilities limited her legal decision making; and (3) Plaintiff had a suspended law license. (ECF No. 44–1 at p. 22) ("If [an] employer claims ... that [a] disabled individual would be unqualified to perform the essential functions of the job even with the proposed accommodation, the disabled individual must prove that he or she would in fact be qualified for the job if the employer were to adopt the proposed accommodation." (quoting *Johnson,* 443 Fed. Appx. at 983)). However, Plaintiff provides that (1) physical presence is not necessary for Plaintiff to perform her essential functions, nor would elimination of such create an undue hardship upon the Defendant; (2) Plaintiff's application stating mental disability occurred only after Defendant denied her accommodation request; and (3) Plaintiff's suspended law license was due to the negligence of Defendant. (ECF No. 53 at pp. 14–23, 25–27).

As to Defendant's first contention, the Court does not find indisputable evidence that physical presence is an essential function of the Attorney 3 position. "A job function is essential if its removal would fundamentally alter the position." *Kiphart v. Saturn Corp.,* 251 F.3d 573, 584 (6th Cir.2001) (citing 42 U.S.C. § 12111(8)).

(2) A job function may be considered essential for any of several reasons, including but not limited to the following:

(i) The function may be essential because the reason the position exists is to perform that function;

(ii)The function may be essential because of the limited number of employees available among whom the performance of that job function can be distributed; and/or

(iii) The function may be highly specialized so that the incumbent in the position is hired for his or her expertise or ability to perform the particular function.

(3) Evidence of whether a particular function is essential includes, but is not limited to:

(i) The employer's judgment as to which functions are essential;

(ii) Written job descriptions prepared before advertising or interviewing applicants for the job;

(iii) The amount of time spent on the job performing the function;

(iv) The consequences of not requiring the incumbent to perform the function;

(v) The terms of a collective bargaining agreement;

(vi) The work experience of past incumbents in the job; and/or

(vii) The current work experience of incumbents in similar jobs.

29 C.F.R. § 1630.2(n). Considering such factors, the Court finds that the majority are in favor of finding physical presence non-essential.[6] It is clear from the record that Plaintiff's position was primarily a case management and delegation position that did not require physical presence.

First, evidence of the employer's judgment as to the requirement of physical presence is inconsistent. The record does not include a clear, written policy requiring physical presence.[7] Although "[Defen-

---

6. Factor (v) does not have sufficient evidence in the record to be considered.

7. Defendant does provide an email from March 14, 2011, which provides:

dant's] President, Jerry Collins, directed ... Patterson to deny [Plaintiff's] request" prior to the interactive process meeting, "Mr. Conway told [Plaintiff] that he and Ms. Griffin believed that [Plaintiff] would be able to work from home." (ECF No. 53–1 at ¶ 111). Such evidence shows an internal inconsistency within the employer's judgment.

Second, Defendant has not provided a written job description that lists physical presence as an essential function.[8] Although the provided written job description of ECF No. 44–11 can be read in a light requiring physical presence, this Court must read these facts in the light most favorable to the Plaintiff. In such case, Plaintiff regularly attended and performed her essential functions in her written job description via telecommunication, and Plaintiff, through normal and usual channels, was able to reschedule or handle every matter via telecommunication in a normal fashion. (ECF No. 53 at pp. 19–20). Although a written job description is " 'often exceedingly good evidence,' " such is not dispositive, especially where, as here, the description at best vaguely describes physical presence. *See Chepak v. New York City Health and Hosps. Corp.,*

No. 11–CV–9698 KBF, 2015 WL 509279, at *8 (S.D.N.Y. Feb. 5, 2015) (quoting *Hodgson v. Corning Glass Works,* 474 F.2d 226, 234 n. 10 (2d Cir.1973)). Additionally, the Defendant has allowed Plaintiff to work remotely in the past. (ECF No. 53 at p. 17). *But see* (ECF No. 56 at p. 11).

Third, the work experience of Fred Jones, a past attorney 3, provides his personal way of handling the essential functions of an attorney 3. It does not, however, provide dispositive evidence that physical presence was essential. *See* (ECF Nos. 44–1 at p. 25; 44–8). To the extent that Plaintiff would be unable to attend a specific event—which is normal due to a typically overblown schedule— Defendant has a clearly defined pecking order for call-outs and other emergency situations based on seniority. *See* (ECF Nos. 44–1 at p. 27; 53 at p. 7).

The question is not whether the functions could be performed, but whether they could be performed effectively from a remote location. *EEOC v. Ford Motor Co.,* 782 F.3d 753, 764 (6th Cir.2015). Such is a "highly fact specific" question that is for the fact finder. *Hoskins,* 227 F.3d at 726 (citing *Brickers v. Cleveland Bd. of Educ.,* 145 F.3d 846, 849 (6th Cir.

---

Please be reminded that office hours for the Legal Department are 8:30 a.m.–5:00 p.m. Monday through Friday. All employees, including lawyers, are expected to be at work and devoting their time and attention to Division business during those hours. As professionals, you are expected to set a good example for the support staff by being in the office on time and staying at work until the end of the day. If you anticipate arriving after 8:30 a.m., please contact the office to inform me of the situation. Likewise, if you have a meeting or hearing in the downtown area that ends before 5:00, you are expected to return to the office to complete the day's work. Please see me with any questions you may have.
(ECF No. 44–14). Importantly, such policy allows for exceptions for anticipated issues, which implies that such presence in the office

is negotiable in light of particular circumstances. By analogy, such presence was always negotiable when attending to outside work.

8. Defendant contends that physical presence is required for the following functions: "(1) giving in-person and on the spot legal advice to various employees of the Division; (2) negotiating settlements and/or attending mediation sessions; (3) attending depositions, court hearings and trials on behalf of the Division (even when outside counsel has been retained); (4) performing call-out functions as needed; (5) supervising the two staff members in the medical department; and (6) accepting service and responding to subpoenas." (ECF No. 44–1 at p. 24); see also (ECF No. 44–11) for comparison.

1998)); *see also Rorrer v. City of Stow*, 743 F.3d 1025, 1043 (6th Cir.2014) ("Determining whether a function is essential 'is a question of fact that is typically not suitable for resolution on a motion for summary judgment.'" (quoting *Keith v. Cnty. of Oakland*, 703 F.3d 918, 926 (6th Cir. 2013))).

■ With regards to Defendant's contention that Plaintiff's mental disability rendered her unqualified, it would be reasonable for the jury to find that Plaintiff's mental disabilities were exacerbated by Defendant's failure to accommodate Plaintiff, and thereby allowing for the reasonable inference that Plaintiff's mental disability's symptoms began on January 2, 2013, but the severity was not present until after the denial of the accommodation. *See* (ECF No. 44–22) (stating that as of January 9, 2013, there was "no effect on [Plaintiff's] ability to perform mental tasks"). Specifically, Plaintiff lists her first symptoms as "[l]ack of sleep, uncontrollable crying, trouble concentrating...." (ECF No. 44–30 at p. 1). Moreover, when asked "Is your condition related to your occupation?", Plaintiff responded with a yes. *Id.* at p. 2. With Dr. Cooper being "unable to state with a reasonable medical certainty what portion of Plaintiff's mental disability stemmed from her dangerous pregnancy, her problems with her husband or having to use her sick leave benefits once her accommodation request was denied," whether Plaintiff's inability to make legal decisions began on January 2, 2013, or after Defendant's failure to accommodate is a question of fact for the jury to consider.

■ As to Plaintiff's suspended law license, the Defendant cannot now claim Plaintiff is unqualified, when such disqualification came by the negligence of the Defendant. Specifically, Plaintiff contends that "[a]ll bills for bar license fees are mailed directly to [Defendant's] billing clerk." (ECF No. 53 at p. 10, 26–27) (stating that Defendant "has always assumed responsibility for paying its attorney's bar license fees"). At the time Plaintiff's payment was due, Defendant had a temporary billing clerk. *Id.* Such billing clerk failed to properly make payment for Plaintiff. *Id.* Additionally, Defendant continued to compensate Plaintiff in the month of April despite Defendant's awareness of the suspension. (ECF No. 44–1 at p. 15). Plaintiff, on the other hand, states that she did not become aware of such suspension until receiving a June 28, 2013 letter from Patterson. (ECF Nos. 53 at p. 10, 26–27; 53–1 at ¶ 78). As such, whether the suspension of the law license was the fault of Defendant or Plaintiff is thereby a question of fact for the jury.

The Court finds that Plaintiff has met her burden in establishing her *prima facie* case. Although Defendant provides evidence to the contrary, such evidence is to be weighed by the jury.

### ii. Whether Defendant suffers an undue hardship

■ Now that Plaintiff has established her prima facie case, the burden shifts to the Defendant to show that the proposed accommodation "'would impose an undue hardship on the operation of its business.'" *Rorrer*, 743 F.3d at 1039 (quoting *Monette*, 90 F.3d at 1183 (citing 42 U.S.C. § 12112(b)(5)(A))). Defendant contends that (1) other attorneys would have to cover where physical presence was required; and (2) Defendant would have to undergo a burdensome system of delivering case files. (ECF No. 44–1 at pp. 32–34). Plaintiff, however, states that Defendant's manpower burden existed *because* Defendant did not allow Plaintiff to work. (ECF No. 53 at p. 23) (stating that Patterson handled Plaintiff's benefit review conference via telephone); (ECF No. 53–1 at ¶ 129) ("Instead, a backlog was created

because no one was handling Plaintiff's case load."). Further, Plaintiff contends that the expense would be minimal, as Plaintiff required only remote access to her electronic files. (ECF No. 53 at p. 23).

An undue hardship is defined as "requiring significant difficulty or expense." 42 U.S.C. § 12111(10)(A).

> In determining whether an accommodation would impose an undue hardship on a covered entity, factors to be considered include—
>
> (i) the nature and cost of the accommodation needed under this Act;
>
> (ii) the overall financial resources of the facility or facilities involved in the provision of the reasonable accommodation; the number of persons employed at such facility; the effect on expenses and resources, or the impact otherwise of such accommodation upon the operation of the facility;
>
> (iii) the overall financial resources of the covered entity; the overall size of the business of a covered entity with respect to the number of its employees; the number, type, and location of its facilities; and
>
> (iv) the type of operation or operations of the covered entity, including the composition, structure, and functions of the workforce of such entity; the geographic separateness, administrative, or fiscal relationship of the facility or facilities in question to the covered entity.

*Id.* at § 12111(10)(B). Without Defendant providing more than conclusory statements, the Court is not able to analyze any of the above factors to determine whether Plaintiff's accommodation requires "significant difficulty or expense." *Id.* at § 12111(10)(A); *see also* (ECF No. 53 at p. 21).

Specifically, Plaintiff's request, at the very least, requires remote access to her electronic files. (ECF No. 53 at p. 23). To the extent that such access is insufficient, all it would require is scanning and then emailing to Plaintiff the necessary documents.[9] Additionally, although an employer does not have to allow all employees to telecommute once it allows one person that option, such past practice is evidence that Defendant would not in fact suffer an undue burden. *See* (ECF Nos. 53 at p. 4; 53–1 at ¶ 113) (allowing Florence Smith, a paralegal, to work from home due to pregnancy related issues, while Cynthia White, an administrative assistant, handled the logistics of delivering necessary files); *see also Ford,* 782 F.3d at 765. The Court does not find sufficient evidence to rule as a matter of law that Defendant would suffer an undue hardship. As such, this will be a question of fact for the jury to weigh and consider.

### iii. Whether Defendant's offered accommodation was reasonable

 Although, "an employee cannot force her employer to provide a specific accommodation if the employer offers another reasonable accommodation," whether Defendant's offering was a *reasonable* accommodation is clearly within the purview of the jury. *See Talley v. Family Dollar Stores of Ohio, Inc.,* 542 F.3d 1099, 1108 (6th Cir.2008) ("If an employee rejects a reasonable accommodation, the individual is no longer considered at 'qualified individual with a disability.'" (citing *Hedrick,* 355 F.3d at 457).) Just as the Sixth Circuit has no "per se rule that an unpaid leave of indefinite duration ... could never constitute a 'reasonable accommodation,'" there is also no per se rule that extended

---

9. Much of the burden required to accommodate Plaintiff could have been parsed out during the interactive process meeting held on January 15, 2013. However, it appears that many of Defendant's concerns were not relayed to Plaintiff until her receiving of the denial letter.

leave does constitute a reasonable accommodation. *See Cehrs v. Ne. Ohio Alzheimer's Research Ctr.*, 155 F.3d 775, 782 (6th Cir.1998) (quoting *Norris v. Allied–Sysco Food Servs., Inc.*, 948 F.Supp. 1418, 1439 (N.D.Cal.1996)); *see also* 29 C.F.R. § 1630.9(b) (making it "unlawful ... to deny employment *opportunities*" (emphasis added)). As such, whether Defendant's offering was reasonable in light of the circumstances is a question of fact for the jury.

### iv. Whether Plaintiff suffered damages

 Lastly, Defendant contends that Plaintiff cannot prove damages. However, it is clear from Defendant's offered accommodation that Plaintiff suffered tangible economic loss by forfeiture of sick leave and reduction in compensation. Further, Plaintiff lost the ability to further "accrue additional sick leave, vacation leave and bonus day benefits while she was unable to work." (ECF No. 53 at p. 27).[10] Moreover, although with no medical certainty, Dr. Cooper testified that the exhaustion of sick leave caused emotional distress upon the Plaintiff. (ECF No. 44–1 at p. 36) (stating that Plaintiff feared not having enough sick leave for after the birth of her child); *see also Turic v. Holland Hospitality, Inc.*, 85 F.3d 1211, 1215 (6th Cir.1996) (allowing testimony of emotional injury without medical support in discrimination cases). As such, whether Plaintiff has sufficiently proved damages is a question for the jury.

### B. Pregnancy Discrimination under the THRA

Defendant moved for summary judgment as to all of Plaintiff's claims. (ECF

Nos. 44 at p. 1; 56 at p. 17). Primarily, Defendant contends—for the same reasons argued for under the ADA—that Plaintiff is not otherwise qualified. As discussed above in Part III.A. and below in Part III.C., this is a matter better suited for the jury.

### C. Retaliation under the ADA and THRA

 "A prima facie case of retaliation requires a showing that '(1) the plaintiff engaged in legally protected activity; (2) the defendant knew about the plaintiff's exercise of this right; (3) the defendant then took an employment action adverse to the plaintiff; and (4) the protected activity and the adverse employer action are causally connected." *Spence v. Donahoe*, 515 Fed.Appx. 561, 572 (6th Cir.2013) (quoting *Gribcheck v. Runyon*, 245 F.3d 547, 550 (6th Cir.2001)). The *McDonnell Douglas* burden-shifting framework applies. *See Penny v. United Parcel Serv.*, 128 F.3d 408, 417 (6th Cir.1997); *see also A.C. v. Shelby County Bd. of Educ.*, 711 F.3d 687, 697 (6th Cir.2013) (" 'The burden of establishing a prima facie case in a retaliation action is not onerous, but one easily met.' " (quoting *Nguyen v. City of Cleveland*, 229 F.3d 559, 563 (6th Cir.2000))).

### i. Whether Plaintiff has sufficient evidence to establish a causal connection between her ADA claim and the contents of her 2013 performance appraisal

 Defendant contends that Plaintiff cannot establish a causal connection between her ADA claim and the contents of her 2013 performance appraisal by tempo-

---

10. Defendant contends that Plaintiff's accrual of benefits are not hers, as she could not have utilized such if she was terminated. (ECF No. 56 at pp. 15 n. 10, 25 ¶ 138 & n. 16). However, Plaintiff is still employed with De-

fendant and was never terminated by Defendant. The Court declines to speculate as to what cause Defendant would have had to terminate Plaintiff.

ral proximity alone. (ECF No. 44–1 at pp. 37–38); *see Lindsey v. Whirlpool Corp.*, 295 Fed.Appx. 758, 769–70 (6th Cir.2008) ("[M]ere temporal proximity between an assertion of Title VII rights and a materially adverse action, *without other indicia of retaliatory conduct*, is not sufficient to establish a causal connection element of a retaliation claim." (emphasis added)). Specifically, the Defendant relies on the fact that Plaintiff had similarly negative comments on her 2007, 2008, and 2010 performance appraisals.[11] (ECF No. 44–1 at p. 38). Additionally, Defendant states that "there can be little doubt that the publicized suspension of Plaintiff's law license while she was an attorney employed by the Division caused negative media attention to the Division." *Id.*

However, Plaintiff does not rely merely on temporal proximity. *Tuttle v. Metro. Gov't of Nashville*, 474 F.3d 307, 321 (6th Cir.2007) ("There are . . . circumstances where temporal proximity, considered with other evidence of retaliatory conduct would be sufficient to establish a causal connection." (citing *Moore v. KUKA Welding Sys.*, 171 F.3d 1073 (6th Cir.1999))). Plaintiff provides that "(1) the content of the comments . . ., (2) the fact that these issues were never brought to [Plaintiff's]

attention prior to her receiving the 2013 [performance appraisal],[12] and (3) [Plaintiff] being completely denied any opportunity to discuss these comments provides additional evidence of retaliatory conduct." (ECF No. 53 at p. 31). Further, Plaintiff claims that the negative media attention has no basis in fact. *Id.* at p. 30. Considering the additional behavior and lack of media coverage linking the Defendant to Plaintiff, the Court finds that there is sufficient evidence of a causal connection to go before the jury.

*ii. Whether Plaintiff has suffered an adverse employment action*

██ Defendant contends that Plaintiff has not suffered an adverse employment action. (ECF No. 44–1 at p. 38). Specifically, Defendant states that they "actually assisted Plaintiff by excusing her from a representation that would have created at least the appearance of a conflict of interest." *Id.; see* Tenn. Supreme Cr. Rule 8, RPC 1.7(a)(2) ("A concurrent conflict of interest exists if . . . there is a significant risk that the representation will be materially limited by the . . . personal interest of the lawyer."). Such provides an articulated reason for why such was not retaliatory, but it does not make the decision less adverse.[13] As such, Plaintiff has sufficient-

---

**11.** Such argument fails to take into account that Plaintiff after receiving the comments on three separate performance appraisals may have improved. Without the 2011 and 2012 performance appraisals in the record, the Court can only assume that such comments were not found in the more recent reviews of 2011 and 2012, which suggests that Plaintiff may have utilized the past comments to improve her work.

**12.** Although Defendant provides the 2010 performance appraisal, which states that Plaintiff was counseled regarding her difficulty to get along with certain staff, as proof that such issues were brought to Plaintiff attention prior to 2013, the Court must look towards the 2013 retaliatory history. (ECF No. 56 at p. 15). Plaintiff is not complaining that the

2010 performance appraisal is retaliatory. Therefore, in the context of 2013, the Defendant has not provided proof that Plaintiff received any discussion during 2013.

**13.** Plaintiff states that taking "these assignments away from [Plaintiff] creates the appearance—to colleagues as well as any potential future employers—that [Plaintiff] is incapable or unable to handle them, or unable to keep any personal issues separate from her professional responsibilities." (ECF No. 53 at p. 32). Additionally, such reassignment has the potential to take out a rather significant portion of Plaintiff's case load. Moreover, Plaintiff contends that such ethical rule was never cited by Defendant at the time of reassignment. *See* (ECF No. 53 at p. 33).

ly shown that she suffered an adverse employment action.

### iii. Whether Defendant's articulated reasons can be found as pretextual

██ Defendant contends that Plaintiff cannot present evidence that Defendant's articulated reasons are pretext. (ECF No. 44–1 at pp. 37–39). However, "the same circumstances which establish a causal connection between [Plaintiff's] protected activity and her termination also serve as sufficient evidence" of pretext. *Cantrell v. Nissan N. Am., Inc.*, 145 Fed.Appx. 99, 107 (6th Cir.2005); *see also Chen v. Dow Chem. Co.*, 580 F.3d 394, 400 n. 4 (6th Cir.2009) ("At the summary judgment stage, the issue is whether the plaintiff has produced evidence from which a jury could reasonably doubt the employer's explanation."). For the reasons in Part III.C.i–ii., this Court finds sufficient evidence to go before the jury.

## IV. CONCLUSION

For the reasons stated above, the Court DENIES Defendant's Motion for Summary Judgment.

